Opinion
 

 ORTEGA, Acting P. J.
 

 We affirm the summary judgment granted to the City of Long Beach in this drowning case.
 

 Background
 

 A four-year-old girl drowned in an apartment house swimming pool, owned by the Azar family and its alter ego, Grande Properties. For approximately the three previous years, the City of Long Beach had, pursuant to its
 
 *1372
 
 municipal code, routinely inspected the pool and issued numerous citations for safety violations, giving notice that the pool was to be closed until the defects were corrected. The pool’s gate was broken off its hinges and was not self-closing or self-latching. The owners did not correct the violations.
 

 Nearly two years before the drowning, Charles Azar was given two weeks to correct the conditions or face a criminal complaint. After referral to the city prosecutor’s office, at least four more inspections were made before the arraignment date, and the defects remained uncured. More than six months later, the owners had failed to correct the defects and Paul Azar was told he faced criminal prosecution.
 

 Eventually Paul Azar acquired full title and the charges against Charles were dismissed. Continued violations were noted and threats of prosecution sent to Paul. By the time of the drowning, the pool had been ordered closed numerous times. The gate had never been fixed and now inadequate chlorination prevented one from seeing the bottom of the pool. More notices were sent by the city.
 

 At one point during all of this a city inspector chased children out of and away from the pool. After the drowning, a chain and lock were placed on the gate and a sign posted that the pool was closed. Plaintiff claims and the city denies that it chained the gate. Even after the drowning, the defects remained uncured.
 

 Plaintiff, the child’s mother, sued the owners and the city for a federal civil rights violation and wrongful death. A third cause for willful misconduct named only the owners. The city secured summary judgment on the grounds that this was not a public pool (despite the deposition testimony of a city health department official that this was a public pool) and that no civil rights violation was shown. The owners are not parties to this appeal.
 

 Standard of Review
 

 After examining the facts before the trial judge on a summary judgment motion, an appellate court independently determines their effect as a matter of law.
 
 (Bonus-Bilt, Inc.
 
 v.
 
 United Grocers, Ltd.
 
 (1982) 136 Cal.App.3d 429, 442 [186 Cal.Rptr. 357].)
 

 Despite this independent review, the appellate court applies the same legal standard as did the trial court. Code of Civil Procedure section 437c, subdivision (c), requires the trial court to grant summary judgment if no triable issue exists as to a material fact, and if the papers entitle the moving
 
 *1373
 
 party to a judgment as a matter of law. Emphasizing triable issues rather than disputed facts, summary judgment law turns on issue finding rather than issue determination.
 
 (Walsh
 
 v.
 
 Walsh
 
 (1941) 18 Cal.2d 439, 441-442 [116 P.2d 62].)
 

 Plaintiff attacks the trial court’s stated reasons for granting summary judgment. But our review is not limited by the trial court’s reasons. We review the ruling, not the rationale.
 
 (Barnett
 
 v.
 
 Delta Lines, Inc.
 
 (1982) 137 Cal.App.3d 674, 682 [187 Cal.Rptr. 219].)
 

 Discussion
 

 I
 

 Plaintiff claims the city failed to establish that this was not a public pool. Government Code section 830, subdivision (c) provides that “ ‘[property of a public entity’ and ‘public property’ mean real or personal property owned or controlled by the public entity[.]” Plaintiff concedes the city did not own the pool, but claims it exercised sufficient control to make it a public pool by virtue of various sections of its municipal code defining and regulating nuisances.
 

 One municipal code section defines hazardous pools as attractive nuisances, and thus public nuisances. (Long Beach Mun. Code, § 8.76.010, subd. H.) Another section defines as a public nuisance any dangerous condition whether located in or about a building or on an unoccupied lot.
 
 (Id.
 
 at § 18.08.150.) In addition to various forms of enforcement, including the institution of criminal or civil proceedings, section 8.76.100 of the code provides that the city “is authorized and directed to cause the same to be abated by city forces or private contract[.]” Expenses are charged to the owner and become a lien on the property.
 

 As for buildings themselves, “[w]ithin the limitations of the budget, the building official may cause to be demolished, altered or repaired, at city expense, any building found by the board of examiners, appeals and condemnation to constitute a substandard building or to be a public nuisance” which has not been timely repaired by the owner. (Long Beach Mun. Code, § 18.20.250.) The city’s expenses in correcting the problem “shall be charged to and become an indebtedness of the owner of such building or structure, and thereupon a lien shall attach to the parcel of real property upon which is located the building which is the subject of the proceedings.”
 
 (Ibid.)
 

 Plaintiff points to the municipal code provisions, the city’s power to issue or withhold permits, the ongoing inspections, the inference that the city
 
 *1374
 
 chained the gate, and the evidence that the city, on several occasions, closed the pool and once shooed children out of and away from the pool. All of this, plaintiff argues, shows that the city exercised control over the unsafe pool and allowed it to remain a public nuisance, thus rendering it a public pool.
 

 In
 
 Low
 
 v.
 
 City of Sacramento
 
 (1970) 7 Cal.App.3d 826 [87 Cal.Rptr. 173], the city owned a grassy parking strip between the sidewalk and street curb on Stockton Boulevard, a city street, adjacent to a county owned hospital. “[C]ounty workers mowed and watered the strip, removed debris and filled any holes which developed. A problem arose. Drivers parking on Stockton Boulevard to visit the hospital would drive their automobiles over the rolled curb, permitting their wheels to rest on the parking strip. The strip became unsightly. Mowing the lawn became a difficult problem. The county asked the city to prohibit parking along the hospital frontage, but the city declined. The county suggested the possibility of paving the parking strip but without success. The county then reduced its maintenance activities, ceasing to water the lawn. As the grass died and bare dirt appeared, ruts and holes developed. Automobiles continued to roll over the curb onto the strip, creating more indentations. Each spring the county’s ground crew filled in the holes but took no such action during the rainy winter weather. The county work crew continued to mow what grass was left in the strip and kept it clear of debris.”
 
 (Id.
 
 at p. 830.)
 

 The plaintiff fell on the strip and was injured. The appellate court found that the county had exercised control over the parking strip, and thus satisfied the provisions of Government Code section 830, subdivision (c). “Where the public entity’s relationship to the dangerous property is not clear, aid may be sought by inquiring whether the particular defendant had control, in the sense of power to prevent, remedy or guard against the dangerous condition.”
 
 (Low
 
 v.
 
 City of Sacramento, supra,
 
 7 Cal.App.3d at pp. 833-834.) “[I]n identifying the defendant with whom control resides, location of the power to correct the dangerous condition is an aid.”
 
 (Id.
 
 at p. 832.) The court also found that the county, in spite of a 1911 city annexation of the street, had an underlying fee out to the center of the boulevard.
 

 The question is whether Low’s broad pronouncement applies to a situation where the public entity, while it might have had the statutory authority to take control, did not do so and limited itself to inspections and closing the pool.
 

 Holmes
 
 v.
 
 City of Oakland
 
 (1968) 260 Cal.App.2d 378 [67 Cal.Rptr. 197], found that the city exercised control over a railroad right-of-way over a city street, where a train ran over the plaintiff cutting off both legs. Among other
 
 *1375
 
 things, a city ordinance prohibited steam locomotives and limited the amount of time a stopped train could block a vehicular crossing.
 

 In
 
 Hoover
 
 v.
 
 City of Fresno
 
 (1969) 272 Cal.App.2d 7 [77 Cal.Rptr. 146], the plaintiff was working for a sign company and removing a sign from a pole at the boundary of a street and public sidewalk. The adjacent property, for many years a used car lot, had once contained a gas station. The underground tanks were still in place and vented at the sidewalk. When plaintiff lit an acetylene torch the resulting explosion injured him. The appellate court reversed the city’s summary judgment saying it had failed to establish lack of control over the sidewalk.
 

 “For liability to be imposed on a public entity for a dangerous condition of property, the entity must be in a position to protect against or warn of the hazard. [Citation.] Therefore, the crucial element is not ownership, but rather control.”
 
 (Mamola
 
 v.
 
 State of California
 
 ex rel.
 
 Dept. of Transportation
 
 (1979) 94 Cal.App.3d 781, 788 [156 Cal.Rptr. 614].) The plaintiff was injured when the car in which he was a passenger struck a barricade next to the road and fell into a ravine. The state owned the ravine and was held potentially liable for failing to adequately barricade the ravine. The state could not be held liable for any defect in the road itself, since it retained only an easement and had previously relinquished complete control to the county.
 

 In
 
 Chatman
 
 v.
 
 Alameda County Flood Control etc. Dist.
 
 (1986) 183 Cal.App.3d 424 [228 Cal.Rptr. 257], the plaintiff’s property was damaged by settlement of a culvert under the landfill on which her home sat. The culvert and landfill were the work of a developer in the early part of the century and covered part of a major drainage creek. The defendant flood control district, created in 1949, took over inspection of this area from the city in 1963. Over the years numerous inspections revealed that the culvert pipe was severely corroded. The plaintiff conceded the district did not own the culvert, but attempted to establish liability based on control.
 

 The district had, several years earlier, agreed to assume full responsibility for creek channels once certain conditions were met and had assumed maintenance responsibility for some portions of the creek, but not for that portion running under plaintiffs home.
 

 The appellate court held that the plaintiff had failed to establish that the district controlled the culvert. The district’s inclusion of the creek in its channel clearing program was insufficient to show control of the culvert. “Nor are the inspections conducted by the District sufficient to show control
 
 *1376
 
 of the culvert. The inspections were made either to implement the flood control objectives of the [flood control] project or in response to individual complaints. All of the inspections were necessary to insure effective, continued control of runoff waters. Despite appellant’s arguments to the contrary, there was no evidence that the District controlled the culvert.”
 
 (Chatman
 
 v.
 
 Alameda County Flood Control etc. Dist., supra,
 
 183 Cal.App.3d at p. 431.)
 

 As plaintiff Aaitui points out, nothing in the
 
 Chatman
 
 opinion indicates the flood control district had the duty to repair existing public improvements, as opposed to Long Beach’s code which imposed on it the duty to abate public nuisances and charge the property owner for the costs of doing so.
 

 We are left with cases on both sides of our issue. In those cases establishing control by the public entity, the property involved was the traditional type of municipal or government property—a parking strip, a railroad right of way over a city street, a sidewalk, a state-owned ravine. The only true nonowner, the county in
 
 Low,
 
 routinely maintained the parking strip adjacent to its own property.
 

 On the other side we have
 
 Chatman,
 
 where a nonowner public entity routinely inspected but otherwise exercised no control and performed no maintenance. We don’t know how much leeway applicable statutes gave the Alameda County Flood Control District over rectifying defects or hazards.
 

 In between, we have the instant matter where the municipal code clearly gave the city a lot of power in rectifying hazards and inspectors apparently went beyond mere inspection and actually closed the pool several times (we are not told what this “closing” consisted of), chasing children away at least once.
 

 Plaintiff cites
 
 Duffy
 
 v.
 
 City of Long Beach
 
 (1988) 201 Cal.App.3d 1352 [247 Cal.Rptr. 715], to demonstrate how the city has the power to demolish a private structure that constitutes a nuisance, and to show that such constitutes control. Duffy “had ambition to construct a house with his own efforts. In June 1968 he obtained permits to build a house on his lot. . . in Long Beach. Fifteen years later . . . appellant still had managed to build only a partial structure, a deteriorating open frame shell, which had been declared a nuisance under city ordinances defining nuisance to include buildings left unreasonably in a state of partial construction.”
 
 (Id.
 
 at p. 1356, fns. omitted.)
 

 The owner sued the city and inspectors over the loss of his building. The appellate court affirmed the sustaining of demurrers in the defendants’ favor.
 
 *1377
 
 We certainly accept that a municipality has the power to do what Long Beach did to the
 
 Duffy
 
 structure and in the instant matter could have drained the pool and filled it, or pulled it out of the ground and filled the hole, or erected a fence around the pool, or simply chained the gate, or any other remedy an imaginative bureaucrat could have come up with. But, to accept plaintiff Aaitui’s argument that the power to regulate means Government Code control, would put every municipality in the position of becoming a public safety guarantor even though the most conscientious implementation of regulations will not always prevent tragic occurrences like this.
 

 By plaintiff Aaitui’s analysis, had the
 
 Duffy
 
 structure fallen and injured someone before the city demolished it, the city would have been liable for damage caused by a purely private structure on private property.
 

 We conclude that the swimming pool was not a public pool in spite of the municipal code provisions giving Long Beach the authority to abate the nuisance. The pool was privately owned and controlled, except for the traditional type of oversight exercised by a city over all sorts of property. The city exercised no more control over the pool than it does over a private home for which it refuses to pass final inspection on a remodeling project because the electrical or plumbing installation is not up to code.
 

 The city exercised no routine control over hours of operation, temperature of the pool, who could or could not use it, regular maintenance, chemical balances, or any other of the many activities involved in keeping a pool in good condition. In sum, plaintiffs separate statement in response to the summary judgment motion failed to establish that the city did any more than perform its traditional regulatory function. We will not impose liability by construing such as control, thus leaving municipalities with the Hobson’s choice of regulating and accepting liability or abandoning regulation in order to keep budgets from being busted by lawsuits arising out of accidents they realistically cannot prevent.
 

 Whether a pool is public can be a question of fact, but the determinative facts here are uncontradicted, making the issue one of law.
 
 (Powell
 
 v.
 
 Standard Brands Paint Co.
 
 (1985) 166 Cal.App.3d 357, 362 [212 Cal.Rptr. 395].) Although it is disputed whether the city ultimately chained and locked the gate, even if it did so this was no more than a regulatory action to close the facility after the owner was given more than ample time and failed to correct the hazard. One inspector’s testimony that this was a public pool is a bureaucratic opinion, not a judicial determination.
 

 Plaintiff cites to the California Administrative Code, now the California Code of Regulations, which defines public swimming pools. Section 65503,
 
 *1378
 
 subdivision (a)(9) in chapter 20 of title 22 of the California Code of Regulations specifically includes apartment house pools. Articles 2 and 3 of chapter 20 regulate plans, construction, inspection, maintenance and operation. The regulations are quite specific, even to the point of requiring “an alkaline condition at a pH between 7.2 and 8.0.” (Cal. Code Regs., tit. 22, § 65529, subd. (a).) Section 65545 provides: “If, in the opinion of the enforcing agent, a pool is maintained or operated in a manner which creates an unhealthful, unsafe, or unsanitary condition, the pool may be closed by the enforcing agent. Such a pool shall not be reopened until correction is made, and upon specific written approval of the enforcing agent.”
 

 We reject the argument that calling this a public pool in the Code of Regulations makes it so for purposes of Government Code section 830, subdivision (c). The Code of Regulations has included within its scope all manner of pools except for “private pools maintained by an individual for the use of family and friends.” (Cal. Code Regs., tit. 22, § 65503, subd. (b).) The intent is obviously to regulate safety for pools used by more than a small circle of people.
 

 If Long Beach’s ordinances specifying regulatory procedures for apartment house pools make them city public pools, then so the California Code of Regulations, by imposing all manner of requirements, makes them state public pools. By that logic, we see no reason why the state should not be held liable for this tragic accident.
 

 In sum, for purposes of Government Code section 830, subdivision (c), municipal regulation of privately owned swimming pools does not, in and of itself, make those pools public property. Plaintiff can point to nothing beyond Long Beach’s regulatory actions, so the trial court was correct in its ruling on this point.
 

 II
 

 “The focus of Appellant’s [civil rights claim] is based on allegations that the City with deliberate indifference to the consequences, established and maintained a policy, practice or custom of inadequate training of health inspectors which directly caused Appellant constitutional harm.”
 

 Part of this “inadequate training” is grounded on plaintiffs allegation that the city failed to inform its inspectors of the provisions of the city code allowing the city to abate the nuisance at the owner’s expense. According to plaintiff, “inspectors were completely in the dark as to the provisions of the Code and were not aware that they had that authority and indeed were
 
 *1379
 
 trained not to do so. . . . Additionally, Respondent had a custom, policy and practice of not correcting the public nuisances and charging the property owner, even though its codes required the same.”
 

 Although both sides engage in considerable discussion about whether the “final policymaker” (in this case the city manager) must have implemented the offending policy, that is not the turning point. Assuming failure to abate was city policy, the question is whether that policy implicated Fourteenth Amendment rights. Plaintiff grounds her case on decedent’s right not to be deprived of her life by the government without due process. We do not quarrel with the proposition that all persons have such a right. But, without intending to demean the tragedy and significance of this occurrence, the real claim is that decedent had a right to a safe pool, which we find not guaranteed by the Fourteenth Amendment. (Cf.
 
 Collins
 
 v.
 
 Harker Heights
 
 (1992) 503 U.S. 115 [117 L.Ed.2d 261, 112 S.Ct. 1061] [plaintiff failed to state a Fourteenth Amendment violation by claiming defendant city had a custom and policy of not warning its sanitation employees of noxious sewer gases and not providing proper safety training and protective equipment].)
 

 We shall proceed through a summary of the cases cited by both sides on the issue. These all involve actions brought under 42 United States Code section 1983.
 

 In
 
 Monell
 
 v.
 
 New York City Dept. of Social Services
 
 (1978) 436 U.S. 658 [56 L.Ed.2d 611, 98 S.Ct. 2018], plaintiffs were employees of the department of social services and the board of education. They sued over the department’s policy compelling pregnant employees to take medically unnecessary unpaid leaves of absence. Ruling for plaintiffs, the Supreme Court held that local governing bodies could be held liable for such a constitutional deprivation, but not under the theory of respondeat superior. “[Although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 ‘person,’ by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental ‘custom’ even though such a custom has not received formal approval through the body’s official decisionmaking channels.”
 
 (Id.
 
 at pp. 690-691 [56 L.Ed.2d at pp. 635-636].)
 

 In
 
 Pembaur
 
 v.
 
 Cincinnati
 
 (1986) 475 U.S. 469 [89 L.Ed.2d 452, 106 S.Ct. 1292], the grand jury investigated a physician for welfare fraud. It subpoenaed two of his employees. They failed to appear and warrants were issued for their forcible attendance. The physician barred the door and refused to let sheriffs deputies enter to serve the warrants. Advised by the local prosecutor to enter the location, the deputies were assisted by local police who
 
 *1380
 
 chopped down the door. The employees were not found. The physician was acquitted of welfare fraud, but convicted of obstructing police. He sued several parties and the claim against the county was dismissed on the basis that the deputies were not acting according to official policy. The Supreme Court reversed, holding that the county could be held liable for a single decision under these circumstances. The question of policy does not necessarily encompass an ongoing activity, but is merely meant to insure that the offending act is truly that of the municipality rather than just the employees.
 

 In
 
 Canton
 
 v.
 
 Harris
 
 (1989) 489 U.S. 378 [103 L.Ed.2d 412, 109 S.Ct. 1197], a woman arrested by police exhibited symptoms indicating an immediate need for medical attention. She received no care while in custody. The Supreme Court reiterated that under certain circumstances a municipality can be held liable for constitutional violations resulting from failure to train its employees. “Only where a municipality’s failure to train its employees in a relevant respect evidences a ‘deliberate indifference’ to the rights of its inhabitants can such a shortcoming be properly thought of as a city ‘policy or custom’ that is actionable under § 1983.”
 
 (Id.
 
 at p. 389 [103 L.Ed.2d at pp. 426-427].) The Court of Appeals had reversed a judgment for plaintiff. The Supreme Court remanded for the Court of Appeals to determine whether plaintiff “should have an opportunity to prove her case under the ‘deliberate indifference’ rule.”
 
 (Id.
 
 at p. 392 [103 L.Ed.2d at pp. 428-429].)
 

 In
 
 Graham
 
 v.
 
 Connor
 
 (1989) 490 U.S. 386 [104 L.Ed.2d 443, 109 S.Ct. 1865], a friend drove the diabetic plaintiff to a store to get orange juice to forestall an impending insulin reaction. The store was crowded. Plaintiff, who had rushed in, rushed out, hoping to find juice elsewhere. A police officer became suspicious and stopped the friend’s car. Other officers took plaintiff into custody, rebuffing attempts to explain the situation. Plaintiff suffered numerous injuries. Ruling for plaintiff, the Supreme Court rejected the test requiring “consideration of whether the individual officers acted in ‘good faith’ or ‘maliciously and sadistically for the very purpose of causing harm.’ ”
 
 (Id.
 
 at p. 397 [104 L.Ed.2d at p. 456].) “In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. [Citation.] In most instances, that will be either the Fourth Amendment’s prohibition against unreasonable seizures of the person, or the Eighth Amendment’s ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct. The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized ‘excessive force’ standard.”
 
 (Id.
 
 at p. 394 [104 L.Ed.2d at pp. 453-454].)
 

 
 *1381
 
 In
 
 Martinez
 
 v.
 
 California
 
 (1980) 444 U.S. 277 [62 L.Ed.2d 481, 100 S.Ct. 553], a 15-year-old girl was murdered by a sex offender parolee-5 months after his release. Plaintiffs claimed that the state, by releasing the killer, subjected the girl to deprivation of life without due process. “Regardless of whether, as a matter of state tort law, the parole board could be said either to have had a ‘duty’ to avoid harm to his victim or to have proximately caused her death, [citations], we hold that, taking these particular allegations as true, appellees did not ‘deprive’ appellants’ decedent of life within the meaning of the Fourteenth Amendment. [][]... [The] death is too remote a consequence of the parole officers’ action to hold them responsible under the federal civil rights law. Although a § 1983 claim has been described as ‘a species of tort liability,’ [citation], it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute.”
 
 (Id.
 
 at p. 285 [62 L.Ed.2d at p. 489].)
 

 In
 
 Daniels
 
 v.
 
 Williams
 
 (1986) 474 U.S. 327 [88 L.Ed.2d 662, 106 S.Ct. 662], a state prisoner suffered injuries when he “slipped on a pillow negligently left on the stairs by ... a correctional deputy stationed at the jail.”
 
 (Id.
 
 at p. 328 [88 L.Ed.2d at p. 666].) The Supreme Court affirmed summary judgment for the deputy. “Historically, [the Fourteenth Amendment] guarantee of due process has been applied to
 
 deliberate
 
 decisions of government officials to deprive a person of life, liberty, or property.”
 
 (Id.
 
 at p. 331 [88 L.Ed.2d at p. 668].) The due process clause was “ ‘ “intended to secure the individual from the arbitrary exercise of the powers of government.” ’ ”
 
 (Ibid.)
 
 “[T]he Due Process Clause is simply not implicated by a
 
 negligent
 
 act of an official causing unintended loss of or injury to life, liberty, or property.”
 
 (Id.
 
 at p. 328 [88 L.Ed.2d at p. 666].)
 

 Plaintiff tries to distinguish
 
 Daniels
 
 by pointing out that the instant matter “did not deal with a single negligent act by a state official but a policy or custom which inflicted injury.” But that argument doesn’t answer
 
 Daniels’
 
 point that due process protects against
 
 “deliberate
 
 decisions of government officials to deprive a person of life, liberty, or property.”
 
 (Daniels
 
 v.
 
 Williams, supra,
 
 474 U.S. at p. 331 [88 L.Ed.2d at p. 668].) Nothing in this record comes close to showing that the city, even if it did engage in a policy or custom of failing to abate nuisances, approached anything resembling a deliberate decision to so deprive. It is a stretch beyond our capability to indulge ourselves in the fiction that the city’s alleged policy constituted such a deliberate decision. However plaintiff chooses to characterize the city’s alleged policy, it reveals itself as nothing more than negligence in the performance of regulatory functions.
 

 In
 
 St. Louis
 
 v.
 
 Praprotnik
 
 (1988) 485 U.S. 112 [99 L.Ed.2d 107, 108 S.Ct. 915], a city civil servant successfully appealed a temporary suspension to the
 
 *1382
 
 civil service commission. In response, he was transferred and subsequently laid off. In ruling against the civil servant, the Supreme Court reiterated its earlier holding in
 
 Monell
 
 that liability cannot be based on respondeat superior, but must rest on decisions that constitute municipal policy. Ratification of a subordinate’s, actions can qualify as policy and subject the municipality to liability.
 

 In
 
 DeShaney
 
 v.
 
 Winnebago Cty. Soc. Servs. Dept.
 
 (1989) 489 U.S. 189 [103 L.Ed.2d 249, 109 S.Ct. 998], the county received numerous complaints that a father routinely beat his son. Although the county took some protective measures, it never tried to remove the child from the father’s custody. Eventually, the father administered a beating that left the child permanently brain damaged and profoundly retarded. The Supreme Court upheld judgment in favor of the county. “The [Due Process] Clause is phrased as a limitation on the State’s power to act, not as a guarantee of certain minimal levels of safety and security.”
 
 (Id.
 
 at p. 195 [103 L.Ed.2d atp. 258].) “It may well be that, by voluntarily undertaking to protect [the child] against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger. [Citations.] But the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation. ...[f]... The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.”
 
 (Id.
 
 at pp. 201-203 [103 L.Ed.2d at pp. 262-264].)
 

 The
 
 DeShaney
 
 court rejected the argument that a special relationship existed giving rise to an affirmative constitutional duty to protect the child. “[T]he harms . . . suffered occurred not while he was in the State’s custody, but while he was in the custody of his natural father, who was in no sense a state actor.”
 
 (DeShaney
 
 v.
 
 Winnebago Cty. Soc. Servs. Dept., supra,
 
 489 U.S. at p. 201 [103 L.Ed.2d at pp. 262-263], fn. omitted.)
 

 In all of these cases, save two, whether liability was permitted or foreclosed, the individual or entity sought to be held culpable was present, either physically or through an employee, and involved at the very time the harm was suffered. The exceptions are
 
 Martinez
 
 (sex offender parolee killed girl) and
 
 DeShaney
 
 (known abuser severely and permanently injured his son), both of which held the public entity not liable.
 

 In effect,
 
 Martinez
 
 and
 
 DeShaney
 
 held that the Fourteenth Amendment does not guarantee appropriate bureaucratic decisions. Certainly, a perfectly rational argument can be made that any halfway competent bureaucracy
 
 *1383
 
 should not have paroled a dangerous sex offender (assuming discretion to deny parole existed), or looked the other way until a child beater permanently injured his son. But we have seen nothing to raise this type of decisionmaking to the level of constitutional protections.
 

 So too here, while the city says it did everything it could to bring this pool into compliance, even if its enforcement was less than should be expected, this type of municipal bureaucratic regulatory conduct is not the stuff of which the Supreme Court has declared constitutional protections, even if an ongoing practice can be said to elevate the conduct to a policy or custom.
 

 The obvious foreseeability that a child might drown in an unsafe pool raises negligence issues, but not questions of constitutional deprivation by way of regulatory decisions. It was certainly at least as foreseeable that the sex offender would murder a child and that the abusive father would permanently injure his son. Foreseeability did not cause the Supreme Court to raise the latter two bureaucratic failings to constitutional levels and we see no reason to do so as to Long Beach’s allegedly inadequate swimming pool regulatory conduct.
 

 The cases opening the way for possible liability involve direct conduct between the offending public entity and the claimed victim:
 
 Monell,
 
 pregnant employees compelled to take medically unnecessary unpaid leaves of absence;
 
 Pembaur,
 
 police chopped down door to physician’s office;
 
 Canton,
 
 woman needing medical care arrested and given no care;
 
 Graham,
 
 diabetic injured during arrest. Here, the city’s involvement in the drowning is indirect and its alleged failures, if true, amount to no more than inept performance of its regulatory functions.
 

 In sum, plaintiff has not implicated a constitutional right violated by the city. If plaintiff’s allegations are true, the city negligently performed its regulatory function, allowing this pool to become or remain unsafe. Even if the city’s policy or custom was to let pools go, the decision involves the question of municipal competence, not deprivation of constitutional rights.
 

 Disposition
 

 The judgment is affirmed.
 

 Vogel (Miriam A.), J., and Masterson, J., concurred.