[No. B217634. Second Dist., Div. Four. Jan. 26, 2010.]

PUBLIC UTILITIES COMMISSION, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JULISSA MILLAN et al., Real Parties in Interest.

COUNSEL

Edmund G. Brown, Jr., Attorney General, James M. Schiavenza, Assistant Attorney General, Richard J. Rojo and Heidi T. Salerno, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Bush Gottlieb Singer Lopez Kohanski Adelstein & Dickinson, Robert Kropp, Jr.; and Mark P. Dupont for Real Party in Interest Julissa Millan.

Adrian L. Randolph, Michael L. Johnson; Randolph Cregger & Chalfant and Joseph P. Mascovich for Real Party in Interest Union Pacific Railroad Company.

OPINION

**WILLHITE, Acting P. J.—**

## INTRODUCTION

This mandate proceeding challenges the trial court's denial of a motion for summary adjudication or judgment brought by California's Public Utilities Commission (PUC) in a wrongful death action arising out of a fatal accident at a railroad crossing. The crossing is controlled by flashing lights. Plaintiffs claim that the railroad crossing constitutes a dangerous condition because a 1989 PUC recommendation to upgrade the crossing's warning devices by installing a gate was not implemented. In responding to the PUC's motion, plaintiffs conceded that the PUC does not own the property on which the railroad crossing is located, but contended, nonetheless, that the PUC controls the property within the meaning of Government Code section 830[1] because of its regulatory power over the crossing, including its authority over installation of safety devices. The trial court adopted that analysis and denied the PUC's motion. Decisional law, however, supports a contrary conclusion: a public entity's ability to regulate property it neither owns nor possesses is not equivalent to a public entity having control of the property within the meaning of section 830. We therefore issue a writ of mandate compelling the trial court to summarily adjudicate in the PUC's favor the issue whether the PUC owed a duty to plaintiffs based upon its alleged control of the railroad crossing. In all other respects, we direct the trial court to deny the PUC's motion.

## FACTUAL AND LEGAL BACKGROUND

1. *The Accident and the Lawsuit*

The fatal accident occurred in the City of Carson during the morning of December 4, 2006. Jeremy Salinas, an employee of Union Pacific Railroad

---

[1] All undesignated statutory references are to the Government Code.

Company (Union Pacific), was operating a moving train by remote control while he rode in the outside portion of one of the train's railcars. The train was travelling eastbound on Union Pacific's tracks as it approached Wilmington Avenue. The railroad crossing at Wilmington Avenue is controlled by eight-inch flashing lights, which were installed in 1967.

Wilson Tubalado, driving a truck for Associated Consolidators Express, drove southbound off of the 405 freeway onto Wilmington Avenue toward the railroad crossing. At the crossing, Tubalado's truck collided with Union Pacific's train, pinning Salinas between the truck and the railcar. Salinas died several days later. He is survived by his wife and two children (collectively plaintiffs).

The PUC does not own, possess, or have an interest in the property on which the railroad crossing is located. Union Pacific is responsible for the maintenance of the flashing signals at the crossing as well as the surface of the crossing for two feet in either direction of the tracks; California's Department of Transportation (CalTrans) is responsible for the maintenance of the traffic lights at the freeway exit; and the City of Carson is responsible for the maintenance of the traffic signals at the surface streets.

Plaintiffs filed suit against, among others, the PUC, Union Pacific, Associated Consolidators Express, the City of Carson, and CalTrans. Plaintiffs' negligence allegations against the PUC are found in the third and fourth causes of actions of their complaint. The fifth cause of action for loss of consortium relies upon those negligence allegations.

Plaintiffs' negligence claim is primarily grounded upon sections 830, subdivision (c) and 835. In that regard, they allege essentially that the PUC (and other named defendants) owed a duty because they either owned or controlled "the highway/roadway/streets/grade crossing/intersection/nearby intersections and the warning signals, traffic regulations and protections at the grade crossing" and that this public property constituted a dangerous condition. Plaintiffs further allege that defendants, including the PUC, "failed to provide traffic control and/or warning signals, signs, markings or other devices necessary to warn of a dangerous condition that existed at the grade crossing when said signals, signs or devices would have eliminated the danger." As developed in the summary judgment proceeding, plaintiffs urged that had a gate been installed at the railroad crossing as had been recommended in 1989, the accident would not have occurred.

In addition, one paragraph in each of the third and fourth causes of action cites section 815.6 to support the allegation that the PUC is liable because it breached a mandatory duty to install a safety device at the crossing.[2]

Union Pacific filed a cross-complaint against all the public entities, including the PUC.

## 2. *The PUC*

The PUC, formerly called the Railroad Commission, is a regulatory body of constitutional origin. (Cal. Const., art. XII, § 1 et seq.) In addition to having the authority conferred upon it by the state Constitution, it has the powers granted to it by the Legislature through enactment of the Public Utilities Code. In that regard, the Legislature has provided that no railroad track can be constructed across a public road, highway or street at grade without first obtaining permission from the PUC. (Pub. Util. Code, § 1201.) The PUC has "the exclusive power" "[t]o determine and prescribe the manner . . . and the terms of installation, operation, maintenance, use, and protection . . . of each crossing of a public or publicly used road or highway [or] a street by a railroad." (Pub. Util. Code, § 1202, subd. (a).) In addition, the PUC has the exclusive power "[t]o alter, relocate, or abolish by physical closing" any railroad crossing to pedestrian or motor traffic (Pub. Util. Code, § 1202, subd. (b)) but, because of federal law, lacks the power to bar a railroad from using the train tracks. (See 49 U.S.C. §§ 10501, 20106.)

The PUC is "responsible for inspection, surveillance, and investigation of the rights-of-way, facilities, equipment, and operations of railroads" and shall use all powers granted by state and federal law "to enforce safety laws, rules, regulations, and orders." (Pub. Util. Code, § 309.7, subds. (a), (c).) The PUC "may, after a hearing, require every public utility to construct, maintain, and operate its line, . . . system, equipment, . . . tracks, and premises in a manner so as to promote and safeguard the health and safety of its employees, passengers, customers, and the public. The commission may prescribe, among other things, the installation, use, maintenance, and operation of appropriate safety or other devices or appliances, including interlocking and other protective devices at grade crossings . . . ." (Pub. Util. Code, § 768.) If the PUC believes that a public utility (e.g., a railroad) is failing to do an act required by law, the PUC can commence an action in the superior court against it to seek relief by mandamus or injunction. (Pub. Util. Code, § 2102.) In addition, federal regulations authorize the PUC to inspect the railroads to

---

[2] Section 815.6 provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

determine if equipment, tracks and devices are being properly maintained and to issue reports about defective conditions or noncompliance with federal requirements. (49 C.F.R. § 212.103 (2009).)

The PUC issues general orders governing the maintenance of railroad crossings. General order No. 72-B sets forth the construction standards and maintenance responsibilities at railroad crossings. That order provides that the railroad and the local political subdivision through which the railroad passes have the responsibility to construct and maintain crossings and approaches. General order No. 75-D provides that "[t]he removal, reduction, addition, or change in type of warning devices at each public at-grade crossing, or publicly used private at-grade crossing . . . shall not be permitted unless authorized by the [PUC]. This includes any changes that may affect interconnections with adjacent traffic signals, or any other modification that may impact the safety of the at-grade crossing." According to Richard Clark, director of the PUC's Consumer Protection and Safety Division, the PUC "itself cannot prevent or remedy any perceived defects with railroad crossings and approaches. Instead, [it] has authority to instruct others to do so." If a party fails to follow a PUC instruction, the PUC cannot fix the deficiency but, instead, can file an action to compel the third party to do so.

Pursuant to 23 United States Code section 130, the federal government provides funds to eliminate hazards at existing public grade rail crossings (the section 130 program). Clark explained the process for obtaining 23 United States Code section 130 funds in the following manner. The PUC "analyzes data and nominates rail crossings for improvements, and then works with railroads and local roadway agencies to recommend specific alterations to those crossings. The recommended improvements are then sent to the California Department of Transportation ('CalTrans'), who receives the funds from the Federal government. CalTrans then enters into contractual agreements with the parties to fund improvements. The [PUC] does not provide funds for the improvement of crossings in the State [of California]. [Its] authority is strictly a regulatory function, whereby [its staff] establishes a priority list of crossings that would benefit from improvements. The funds for crossing improvements through this program are exclusively federal."

3. *The 1989 Recommendation*

The core of plaintiffs' negligence claim against the PUC is that the railroad crossing at which the accident occurred constitutes a dangerous condition because the PUC failed to ensure implementation of a 1989 recommendation to upgrade safety precautions at the crossing. The evidence on that point is the following.

In December 1989, a field review of the crossing was conducted by the PUC, the City of Carson, CalTrans, and Union Pacific. As a result, the PUC nominated the crossing as a candidate for 23 United States Code section 130 funds, proposing to upgrade the railroad warning devices through installation of a gate. The crossing was placed on the PUC's priority list in 1990.[3]

In April 1993, before the proposed work was done, Ken Hatai from CalTrans wrote a memo to the file about the project. The memo reads:

"Proposed Gates at Wilmington Grade Crossing s/b RTE 405

"I spoke to Steven Handelman who handles this area for the Calif. Public Utilities Commission. I asked about the procedure for possibly removing this grade crossing from the Federal 130 list of candidates for grade crossing improvements with gates. I mentioned that since our meetings back in 1989, we have observed the existing No. 8 warning lights (and for that matter, our own signals) constantly being damaged by trucks negotiating the short radius and returns at this intersection. He recommended talking to Gene Snyder of Local Assistance then writing a memorandum to Raymond Toohey, Senior Trans. Engr. CPUC about removing this crossing from the Federal section 130 list."

Notwithstanding Hatai's concerns, the crossing *did* remain on the 23 United States Code section 130 list through 1996. Thereafter, it no longer appeared

---

[3] A March 19, 1990 letter from CalTrans to the City of Carson explained:

"We wish to express our appreciation for the City of Carson's willingness to assume the cost of installing the new traffic signal at the southbound Route 405 Freeway off-ramp to Wilmington Avenue.

"This signal, which is being installed under an encroachment permit, should improve the operation of this intersection. However, a condition of the permit was that the City obtain California Public Utilities Commission's review to determine whether or not modifications would be needed for the warning devices at the Southern Pacific Transportation Company's adjacent grade crossing.

"During a field review of the railroad crossing on December 5, 1989, there was agreement between representatives of the City, the Southern Pacific Transportation Company, the Public Utilities Commission (PUC), and Caltrans that the warning lights at the crossing needed to be upgraded with the installation of gates. It was also agreed that, if it were necessary, the City would apply for the Federal 130 funding to upgrade the warning devices and that the City would absorb 10% of the total cost of the installation.

"The PUC has determined that improvements are necessary and it is nominating this railroad crossing as a candidate for upgrading. Therefore, we urge that the City initiate the process of obtaining the Federal 130 funding by contacting Gene Snyder of Caltrans and informing him that the City will absorb the local share of the installation cost."

on the list. None of the parties offered any evidence to explain the section 130 list's failure to include the crossing after 1996.[4]

### 4. *The Summary Judgment Proceeding*

The PUC moved for summary judgment, or in the alternative, summary adjudication, on three grounds. The first ground (and the only one addressed in the PUC's separate statement of undisputed facts) was that it did not own or control the railroad crossing.[5] The second ground relied on several statutory immunities: sections 818.2, 818.6, 820.2 and 815.2, subdivision (b). The third ground claimed that the PUC was entitled to quasi-judicial immunity. Plaintiffs and Union Pacific each submitted opposition to the PUC's motion. Following the PUC's filing of a reply, the trial court conducted a reported hearing.

### 5. *The Trial Court's Ruling*

The trial court denied the PUC's motion. Its ruling explains:

"2. In 1989, the CPUC apparently determined that the railroad crossing at which the fatal accident occurred needed to be upgraded by the installation of gates for vehicular traffic safely to cross the railroad tracks in question. . . . The CPUC had the authority to close the intersection to vehicular traffic if the upgrade were not accomplished. See PUC § 1202(b).

"3. For reasons that are not clear from the record, the upgrade did not happen, nor was the crossing closed to vehicles. It is a reasonable inference

---

[4] In a March 2009 deposition, Bree Arnett, who had been the PUC Section 130 program coordinator for the previous five years, was asked if anything in her file "would show why this crossing was removed from the section 130 list." She replied, "[n]ot specifically" but "[g]enerally, there was one letter." She was then shown a redacted copy of an August 1, 1995 letter from the City of Carson to CalTrans. The letter is not included in the record in this writ proceeding but she read a portion of it, which states: "This crossing is located at the intersection of Wilmington Avenue and the San Diego Freeway (I-405) southbound off-ramp, partially within CalTrans right-of-way. If any modification is desired, that is up to CalTrans to initiate and fund." When asked to explain the crossing's removal from the 23 United States Code section 130 list she replied: "This is the only indication that there may have been some issue with that crossing."

[5] To refute plaintiffs' theory that the PUC was liable under section 815.6 for breach of a mandatory duty to install safety devices at the crossing, the PUC's motion argued that the PUC was not "under a legal duty to require any particular safety precautions or equipment at a railroad crossing because [its] duties to regulate public utilities . . . are permissive, not mandatory." The PUC cited Public Utilities Code sections 701 ("The commission *may* supervise and regulate every public utility in the State and *may* do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." (italics added)) and 14 (" 'Shall' is mandatory and 'may' is permissive."). However, the PUC's separate statement of undisputed facts did not address this theory of liability.

from the evidence that the accident and death of Mr. Salinas would not have happened if the gates had been in place, or the road had been closed.

"4. The Court finds that the reasoning of *Low v. City of Sacramento* (1970) 7 Cal.App.3d 826, 833–834 [87 Cal.Rptr. 173] is persuasive in this setting. Therefore, on these facts, and drawing inferences in favor of plaintiffs, the CPUC had the power to avoid the accident; it therefore controlled the property in question, and has potential liability under GC §§ 830(c) and 835 for a dangerous condition of its property.

"5. Even though the CPUC could be liable, it still could avoid liability on the grounds of statutory immunity. The CPUC argued in its papers that it is immune as a matter of law under GC §§ 815.2(b), 8[1]8.2, 8[1]8.6 and 820.2.

"6. However, the court did not see anything in the CPUC's Separate Statement of Undisputed Facts which addressed its immunity claim with respect to this crossing. There is simply no evidence showing why the 'necessary' upgrade did not happen, or the crossing did not get closed. That being the case, there is no basis for the court to find that the CPUC exercised its discretion in connection with the upgrade not taking place, or the crossing not being closed. Again, drawing inferences in favor of the opposing parties, and immunity being an affirmative defense, the CPUC's motions for summary judgment and for summary adjudication must be denied."

This petition by the PUC followed. The petition states that the issues presented are whether the PUC controlled the railroad crossing and whether the PUC is entitled to various statutory immunity defenses. Following our issuance of an alternative writ, plaintiffs and Union Pacific filed separate replies to the petition. Neither the petition nor the replies directly address plaintiffs' theory that the PUC is liable for breach of a mandatory duty. For the reasons explained below, we conclude that as a matter of law the PUC did not control the railroad crossing. We therefore issue a writ of mandate directing the trial court to summarily adjudicate in favor of the PUC the issue whether it owed a duty to plaintiffs based upon the allegation that it controlled the railroad crossing.

## DISCUSSION

A public entity is liable for injuries caused by a dangerous condition "of its property."[6] (§ 835.) Section 830, subdivision (c) defines "property of a public entity" and "public property" as real property "owned or controlled by

---

[6] Section 835 provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was

the public entity" but it does "not include easements, encroachments and other property that are located on the property of the public entity but are not owned or controlled by the public entity."

Plaintiffs concede that the PUC does not own the property (the railroad crossing) on which the accident occurred. Instead, plaintiffs urge that the PUC's regulatory authority over the railroad crossing constitutes control within the meaning of section 830 so that the PUC can be liable for the dangerous condition created by the failure to install a gate. Two cases are instructive in deciding this issue.

The first is *Chatman v. Alameda County Flood Control etc. Dist.* (1986) 183 Cal.App.3d 424 [228 Cal.Rptr. 257] (*Chatman*). There, the issue was whether a county flood control district (the district) was liable for damages caused by the allegedly dangerous condition of a culvert located under the landfill on which the plaintiff's home was built. The culvert and landfill had originally been constructed under the home by a developer in the early 20th century. (*Id.* at p. 426.) The district was created in 1949. (*Ibid.*) No public entity, including the district, was ever granted an easement for the reach of the culvert. (*Id.* at p. 427.) Over the years, the district inspected the culvert on several occasions as part of a program to identify problems in the underground system. The district found the pipes were corroded, eroded, and cracked. At one point, a district engineer suggested repair of the culvert. In addition, the district included the culvert in a channel clearing program. (*Ibid.*) Further, the district required preapproval for all work done on the culvert. (*Id.* at p. 431.) The homeowner under whose property the culvert was located sued the district (among others), claiming that the culvert constituted a dangerous condition. She alleged that water had escaped from the culvert and undermined the land under her house, damaging her property. (*Id.* at p. 428.)

In summary judgment litigation, the homeowner conceded that the district did not own the culvert, but claimed, instead, that the district controlled the culvert. She relied upon the district's multiple inspections of the culvert, its requirement that it preapprove all work done on the culvert, and its inclusion of the culvert in the channel clearing program. The trial court was not persuaded and granted summary judgment to the district. The appellate court affirmed that ruling. Noting that the district had never assumed maintenance

in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

responsibility for the culvert, the reviewing court found that the district's inclusion of it in a channel clearing program was "insufficient to show control of the culvert." (*Chatman, supra,* 183 Cal.App.3d at p. 431.) Furthermore, it found that the district's inspections were insufficient "to show control of the · culvert. The inspections were made either to implement the flood control objectives of [a local] project or in response to individual complaints. All of the inspections were necessary to insure effective, continued control of runoff waters." (*Ibid.*) Lastly, the reviewing court rejected the homeowner's argument that "the District's requirement of preapproving all work done on the culvert" was evidence of control. (*Ibid.*) It reasoned: "A homeowner frequently must obtain a building permit prior to repairing or remodeling his or her house. *This does not imply, however, that the regulatory agency 'controls' that home.*" (*Ibid.,* italics added.)

The second decision we find instructive is *Aaitui v. Grande Properties* (1994) 29 Cal.App.4th 1369 [35 Cal.Rptr.2d 123] (*Aaitui*). There, our colleagues in Division One relied upon *Chatman* to conclude that a city's regulatory power over a private swimming pool did not equate with the concept of control as found in section 830. *Aaitui* concerned a wrongful death action filed after a young child drowned in an apartment house swimming pool. The plaintiff sued, among others, the City of Long Beach on the theory that the city's power to regulate private swimming pools effectively made the pool in which the fatal accident occurred a public pool and therefore public property within the meaning of section 830. On that point, the evidence presented during summary judgment litigation established the following. The city's municipal code granted it broad powers to inspect and regulate swimming pools under its police power to abate a public nuisance. (29 Cal.App.4th at p. 1373.) In the three years preceding the accident, the city had routinely inspected the pool, issued numerous citations for safety violations and had given notice that the pool would be closed until the violations were cured. The building owners did not correct any of the violations. (*Id.* at pp. 1371–1372.) In the two years preceding the accident, the city prosecutor on numerous occasions threatened the building owners with criminal prosecution unless the safety violations were corrected. By the time of the drowning, the city had ordered the pool closed numerous times. On one occasion, a city inspector chased children out of and away from the pool. After the drowning, the city chained the gate to the pool. (*Id.* at p. 1372.) The trial court granted summary judgment to the city, finding as a matter of law that the pool was not a public pool so that the city had no liability under section 830, subdivision (c).

The appellate court upheld the trial court's judgment. It reasoned: "[T]he swimming pool was not a public pool in spite of the municipal code provisions giving [the city] the authority to abate the nuisance. The pool was privately owned and controlled, except for the traditional type of oversight

exercised by a city over all sorts of property. The city exercised no more control over the pool than it does over a private home for which it refuses to pass final inspection on a remodeling project because the electrical or plumbing installation is not up to code. [¶] The city exercised no routine control over hours of operation, temperature of the pool, who could or could not use it, regular maintenance, chemical balances, or any other of the many activities involved in keeping a pool in good condition." (*Aaitui, supra,* 29 Cal.App.4th at p. 1377.) The appellate court went so far to note that the city "could have drained the pool and filled it, or pulled it out of the ground and filled the hole, or erected a fence around the pool, or simply chained the gate," but that none of these actions would have "*establish[ed] that the city did any more than perform its traditional regulatory function.* We will not impose liability by construing such as control, thus leaving municipalities with the Hobson's choice of regulating and accepting liability or abandoning regulation in order to keep budgets from being busted by lawsuits arising out of accidents they realistically cannot prevent. [¶] . . . [¶] In sum, *for purposes of Government Code section 830, subdivision (c), municipal regulation of privately owned swimming pools does not, in and of itself, make those pools public property.* Plaintiff can point to nothing beyond [the city's] regulatory actions, so the trial court was correct" in granting summary judgment to the city. (*Id.* at pp. 1377–1378, italics added.) "[T]o accept plaintiff['s] . . . argument that the power to regulate means Government Code control, would put every municipality in the position of becoming a public safety guarantor even though the most conscientious implementation of regulations will not always prevent tragic occurrences like this." (*Id.* at p. 1377; see also *Zamudio v. City and County of San Francisco* (1999) 70 Cal.App.4th 445, 453 [82 Cal.Rptr.2d 664] ["As [was] held in *Chatman,* the right to inspect premises for unsafe structural conditions, or efforts undertaken to increase public safety such as the inspections and generalized exhortations in favor of a safe workplace in this case, would not make a public entity automatically liable for all accidents which later occur . . . ."].)

■ Reading *Chatman* and *Aaitui* together, we conclude that the PUC's regulatory authority over the crossing does not establish control of that property within the meaning of section 830. To begin, the PUC does not own the property and holds no interest in it.[7] It is Union Pacific's responsibility to maintain the flashing signals at the crossing. Further, pursuant to the PUC's general order No. 72-B, Union Pacific has the responsibility to maintain the crossing and an area two feet outside the tracks and the City of Carson has the responsibility "to maintain the approaches and those portions of the crossing not included under [the] railroad['s] responsibility." The PUC has no authority to correct any defects (safety or otherwise) associated with the crossing. The PUC can only order others to take prophylactic measures. That

---

[7] The record does not clearly indicate who owns the railroad crossing.

general order No. 75-D provides that the PUC must give permission to any entity which seeks to change the warning devices at a railroad crossing does not equate with PUC control of the property. We find no material difference from *Chatman*, which held that the flood control district's requirement that it preapprove any work on the culvert did not establish its control of the culvert within the meaning of section 830.

Further, the PUC's right to inspect the crossing for safety violations and to close the crossing to vehicular and pedestrian (but not railroad) traffic does not establish control. Essentially, these are the same powers that the city in *Aaitui* exercised over the swimming pool in the privately owned apartment, but the appellate court held that those powers were insufficient to establish government control of the pool because the city had done no "more than perform its traditional regulatory function" of taking action to ensure safe conditions existed at the swimming pool. (*Aaitui, supra,* 29 Cal.App.4th at p. 1377.) Similarly, the PUC's authority, inter alia, to approve changes at the crossing, review any work to be done at the crossing, and inspect completed work at the crossing, is simply part and parcel of its regulatory function to ensure safe conditions at a railroad crossing. None of these powers, whether viewed singly or collectively, give the PUC control over the property so as to make it liable for a dangerous condition under section 835. Viewed in this context, the PUC's 1990 placement of the crossing on the 23 United States Code section 130 priority list to receive federal funding to install a gate[8] was but one manifestation of its broad regulatory power over crossings.[9] It did not establish the PUC's control over the property.

---

[8] Union Pacific claims that "the evidence proves that the CPUC *ordered* installation of gates and thereafter did not discharge its duty to ensure that gates were installed." (Italics added.) Union Pacific overstates the record. The evidence established only that the PUC, in conjunction with the City of Carson, Union Pacific and CalTrans, agreed that a gate should be installed at the crossing and that the PUC thereafter placed the crossing on the 23 United States Code section 130 list to receive federal funding. There is no evidence that the PUC ever *ordered* anyone to install the gate. Similarly unsupported by the record is plaintiffs' claim that the PUC "*required* that gates be installed at the Wilmington Avenue crossing." (Italics added.)

[9] The PUC argues that because "neither the documents and information concerning [the] Section 130 program nor the investigation concerning the crossing can be used in civil cases," its placement of the crossing on the 23 United States Code section 130 list cannot be used as evidence to establish its control of the property. The PUC cites federal statutory and decisional law to support its argument. (*Pierce County v. Guillen* (2003) 537 U.S 129 [154 L.Ed.2d 610, 123 S.Ct. 720]; *Harrison v. Burlington Northern R. Co.* (7th Cir. 1992) 965 F.2d 155, 159; *Robertson v. Union Pacific R. Co.* (8th Cir. 1992) 954 F.2d 1433, 1435; and 23 U.S.C. § 409.) We cannot reach the merits of this claim because it has not been preserved for review. If the PUC wished to object plaintiffs' and Union Pacific's reliance upon this evidence, the PUC was required to file a separate document setting forth its objections to this evidence when it submitted its reply to the opposition papers to its motion. (Cal. Rules of Court, rule 3.1354(a) & (b).) The PUC did not comply with this procedure. Instead, it simply raised the claim in the middle of the points and authorities it offered in support of its motion. Further, it

■   Plaintiffs and Union Pacific attempt to distinguish *Chatman* and *Aaitui* on the basis that those cases involved private property. In the context of the legal issue raised by this case, that is a distinction without a difference. As set forth earlier, the salient point is that the PUC neither owns the railroad crossing nor possesses any interest in it. That the railroad crossing *may be* public property (but see fn. 7, *ante*) is beside the point. Union Pacific and the City of Carson are the entities responsible for maintaining the crossing and the immediately adjacent area. The PUC's regulatory authority over the crossing does not give it the power to remedy any dangerous condition on it; it can only order a party to take corrective action. We therefore conclude that the holdings of *Chatman* and *Aaitui* that regulatory authority (over private property) is not the equivalent of control over the property with the meaning of section 830 apply to a railroad crossing.

Next, plaintiffs and Union Pacific rely (as did the trial court) on *Low v. City of Sacramento, supra*, 7 Cal.App.3d 826 (*Low*) to support the conclusion that a triable issue of fact exists whether the PUC controlled the railroad crossing. *Low* is clearly distinguishable.

*Low* involved a slip and fall accident. The plaintiff was injured when she fell on a parking strip between a sidewalk and a street curb outside a County of Sacramento hospital. (*Low, supra*, 7 Cal.App.3d at p. 830.) The parking strip was part of a public street easement owned by the City of Sacramento on land held in fee by the county. (*Id.* at p. 834.) The issue was whether the county (in addition to the city) could be liable for the dangerous condition on the parking strip. As set forth above, subdivision (c) of section 830 defines property of a public entity as real property owned or controlled by the public

did not raise the objection at the hearing on the motion. The objection has therefore been forfeited. (See Code Civ. Proc., § 437c, subd. (b)(5); *Woodridge Escondido Property Owners Assn. v. Nielsen* (2005) 130 Cal.App.4th 559, 569 [30 Cal.Rptr.3d 15].)

The PUC also makes a passing argument that the trial court erred in disallowing evidence it offered when it filed its reply to plaintiffs' and Union Pacific's oppositions. The evidence consisted of plaintiffs' responses to the PUC's special interrogatories in which plaintiffs stated they did "not contend that the PUC had the duty to physically install the railroad crossings gates." At the hearing on the motion, the trial court sustained plaintiffs' objection to the evidence and ordered it stricken, stating it "came in late." The PUC's counsel replied: "Well, it's only because discovery responses came after my motion for summary judgment." The trial court replied: "Well, I'm sorry. I'm not going to look at them because I [would] never get done with this motion."

The PUC's complaint about the trial court's ruling is limited to a one-paragraph footnote in its petition. In it, the PUC fails to state that the standard of review applicable to a trial court's evidentiary ruling in a summary judgment proceeding is abuse of discretion (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 [23 Cal.Rptr.3d 915]) and fails to argue why the ruling was an abuse of discretion. This deficient presentation constitutes a forfeiture of any claim of error. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273] [When a party raises a point but "fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

entity but does "not include easements . . . that are located on the property of the public entity but are not owned or controlled by the public entity." The Legislature excluded easements "not owned or controlled by the public entity, that may be located on the property of a public entity in order to make clear that it is not the duty of the owner of the servient estate to inspect such property for hazards; rather, it is the duty of the person or entity that owns the easement." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 830, p. 299.) Consequently, the easement exception would have precluded the county's liability in *Low* unless the county controlled the easement.

At trial, the evidence established that the county had, over the years, retained extensive control because it had maintained the parking strip (mowed the grass) and had cleared it of dangerous conditions. (*Low, supra,* 7 Cal.App.3d at p. 830.) Based upon that showing, the trial court ruled that as a matter of law the county controlled the parking strip and was therefore liable (along with the city) to the plaintiff. (*Id.* at p. 829.) The county appealed but the reviewing court affirmed the trial court's ruling. It explained: "Where the public entity's relationship to the dangerous property is not clear, aid may be sought by inquiring whether the particular defendant had control, in the sense of power to prevent, remedy or guard against the dangerous condition; whether [its] ownership is a naked title or whether it is coupled with control; and whether a private defendant, having a similar relationship to the property, would be responsible for its safe condition. [¶] In this case each defendant had a species of ownership in the parking strip—the city as holder of the street easement and the county as holder of the underlying fee. More important, each had control—the city as holder of the public easement and the county as abutting owner. Like a private abutting owner, the county undertook to maintain the grassy surface of the parking strip. In this activity it was subject only to the exercise of the city's control as owner of the public street easement. The county permitted the parking strip to deteriorate. It had the power of control both to prevent its deterioration and to remedy it. Although subdivision (c) of section 830 forecloses liability where the public entity has surrendered control to an easement holder, *here the county retained control, in the sense that it retained power to prevent or remedy the danger.* [Citation.] *Coupled with its ownership of the underlying fee was a set of powers amounting to 'control' in the statutory sense.*" (*Id.* at pp. 833–834, fn. omitted, italics added.)

*Low* does not assist plaintiffs because its analytical framework is inapposite to this case. There, the county owned in fee the land on which the plaintiff was injured but had granted the city an easement on the property. "[T]he easement exception [in section 830, subdivision (c)] would have exempted the county from dangerous condition liability unless the county owned or controlled the easement. It was in the context of whether or not the county

could take advantage of the easement exception that *Low* concluded an analysis of *control* was necessary." (*Huffman v. City of Poway* (2000) 84 Cal.App.4th 975, 990, fn. 19 [101 Cal.Rptr.2d 325].) Consequently, *Low's* control analysis must be read in its true context: application of the easement exception when a defendant owns a fee interest in the property. *Low* did not address the issue raised here: does the regulatory authority of a defendant which does not own *any* interest in the property constitute control within the meaning of section 830? On that issue, we conclude that *Chatman* and *Aaitui* offer far more meaningful analyses than *Low* does.

Furthermore, *Low* is clearly factually distinguishable because there the county *actively* maintained control of the property by taking care of the grass on it and clearing it of potentially dangerous conditions. Here, in contrast, *no evidence* was offered that the PUC *ever actively* maintained the railroad crossing through any form of maintenance or repair. In fact, the uncontradicted evidence established that the PUC lacked the authority to actively maintain or repair the crossing and had only the authority to order others to correct or upgrade. We therefore reject plaintiffs' argument, based upon *Low*, that the PUC's "regulatory authority . . . allowed it to prevent or remedy dangerous conditions at the railroad crossing" so that its "power to prevent or remedy danger is sufficient to constitute control."

Lastly, plaintiffs argue that the PUC "had an ongoing obligation to ensure that its recommendations for the crossing (the installation of the gates) were implemented." Union Pacific advances a similar argument by contending that the PUC has "the duty to ensure that its [1989] decision [to install a gate] is implemented." Neither plaintiffs nor Union Pacific offer any legal authority to support this proposition. Instead, they rely upon an isolated passage in deposition testimony from Laurence Michael. Michael had been a utilities engineer with the PUC for two years. His job responsibilities include regulatory evaluation and oversight of safety issues at railroad crossings. He was asked by Union Pacific's counsel: "Do you agree that . . . the utilities engineer person who has jurisdiction over the crossing, has an ongoing duty to make the recommendations happen for a grade crossing?" Over the objection of counsel for the PUC that the question called for an answer beyond Michael's "scope of . . . experience and ask[ed] for a legal conclusion," Michael answered "yes."

Plaintiffs' and Union Pacific's reliance upon Michael's testimony is unavailing. Whether the PUC has a continuing obligation to ensure that a gate be installed at the crossing is a legal question to be answered by the controlling statutes and regulations. Michael's answer, untethered to any legal authority, sheds no light on the question. (See *Aaitui, supra*, 29 Cal.App.4th at p. 1377 ["One inspector's testimony that this was a public pool is a

bureaucratic opinion, not a judicial determination."].) And, as noted above, neither plaintiffs nor Union Pacific have offered any authority to support the proposition that the PUC *did have* such a continuing obligation. Consequently, we reject plaintiffs' argument that "[e]ven if the statutory regulatory scheme was not sufficient to result in the CPUC having control over the Wilmington Avenue crossing, once the CPUC undertook its 1989 analysis, determined that hazard elimination was required and never rescinded the order for that upgrade, the CPUC had *de facto* control over the crossing, especially in light of its ongoing obligation to ensure that its recommendations were implemented."

■   In conclusion, the determinative facts were uncontradicted. As such, the question whether the crossing was controlled by the PUC within the meaning of section 830 was an issue of law. (See *Aaitui, supra,* 29 Cal.App.4th at p. 1377.) The trial court therefore erred in concluding that there was a triable issue of material fact on this issue. Although the PUC requests that we issue a writ directing the trial court to grant summary judgment in its favor, we decline to do so. As explained earlier, plaintiffs' two negligence causes of action (as well as the derivative cause of action for consortium) also contain the allegation based upon section 815.6 that the PUC is liable for breach of a mandatory duty. The trial court's ruling did not address that theory of liability and the parties have not discussed it in this proceeding. However, subdivision (f)(1) of Code of Civil Procedure section 437c permits a trial court to summarily adjudicate an issue of duty.[10] "Commentators have suggested an example of a proper summary adjudication of an issue of duty in the negligence context: 'A negligence action may be based on both the general duty of due care and specific statutory duties. Defendant may seek summary adjudication it did not owe a certain statutory duty without disposing of the action based on the general duty of due care.' [Citation.]" (*Regan Roofing Co. v. Superior Court* (1994) 24 Cal.App.4th 425, 434, fn. 5 [29 Cal.Rptr.2d 413], disapproved on another ground in *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541, 563–565 [79 Cal.Rptr.3d 721, 187 P.3d 424].) Here, plaintiffs alleged two duty analyses in their negligence causes of action: one based upon control of the property (§§ 830, subd. (c), 835) and the other based upon a "mandatory duty imposed by an enactment" (§ 815.6). We therefore direct the trial court to set aside its order denying the PUC's summary judgment motion, to enter an order granting summary adjudication of the third, fourth and fifth causes of action to the extent that they allege that the PUC owed a duty under sections 830,

---

[10] Code of Civil Procedure section 437c, subdivision (f)(1) provides, in relevant part: "A party may move for summary adjudication as to . . . one or more issues of duty, if that party contends . . . that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. A motion for summary adjudication shall be granted only if it completely disposes of . . . an issue of duty."

subdivision (c) and 835 because it controlled the railroad crossing, and to deny the PUC's motion in all other respects.[11] (See also *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1688, fn. 11 [60 Cal.Rptr.2d 195] [Because "plaintiffs pleaded their case by combining causes of action[, the defendant was] entitled to present summary adjudication motions that dispose of allegations which would have formed a single cause of action if properly pleaded"].)

## DISPOSITION

Let a peremptory writ of mandate issue compelling respondent court to set aside its order of June 12, 2009, denying petitioner Public Utilities Commission's motion for summary judgment and to enter an order granting summary adjudication of the third, fourth and fifth causes of action to the extent that they allege that the PUC owed a duty under sections 830, subdivision (c) and 835 because it controlled the railroad crossing and denying the PUC's motion in all other respects. Petitioner is to recover its costs in this proceeding. (Cal. Rules of Court, rule 8.493(a)(1)(A).)

Manella, J., and Suzukawa, J., concurred.

[11] Because we conclude that the PUC did not control the railroad crossing, there is no need to address any of the PUC's arguments that various immunity statutes apply to this case.