Filed 3/18/14  Kurz v. Santa Clara Valley Transportation Authority CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ERIC KURZ et al., | H039163 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. 1-08-CV117081) |
| v. | |
| SANTA CLARA VALLEY TRANSPORTATION AUTHORITY et al., | |
| Defendants and Respondents. | |

This personal injury action arises from a 2007 collision between plaintiff Eric Kurz's vehicle and a light rail train operated by defendant Santa Clara Valley Transportation Authority (VTA).  Eric and his wife, Jennifer, (collectively the Kurzes) sought to recover from VTA for personal injuries and loss of consortium, respectively.[1] After granting two motions for summary adjudication in VTA's favor, the trial court entered judgment in favor of VTA.  The court also denied the Kurzes' motion to strike or tax VTA's expert witness fees.  The Kurzes appeal from the final judgment and the denial of their motion to strike or tax VTA's expert witness fees.  We affirm.

---

[1] We will refer to the parties by their given names for purposes of clarity and not out of disrespect.  (*In re Marriage of Thorne & Raccina* (2012) 203 Cal.App.4th 492, 495, fn. 1.)

## I. BACKGROUND

### A. Factual Background[2]

#### 1. The Accident

On August 2, 2007, Eric--an on-duty San Jose police detective driving an unmarked police car--was travelling northbound in the left lane on First Street, in San Jose. He made an illegal left turn and, in doing so, crossed VTA light rail tracks and was struck by a light rail train operated by VTA employee Barbara Knatcher. A camera mounted on the light rail train showed that the rear left turn signal on Eric's vehicle was visible from the train operator's position for six seconds prior to the collision. Knatcher testified that she did not become aware of Eric's vehicle, until it was in front of the train, at which point she applied the brakes. She did not sound the train's horns and bells in advance of the accident. An intersection where left turns are legal was located approximately 100 feet north of the accident site.

Eric has no memory of the accident, in which he sustained serious injuries. He stated in a declaration that "it has always been my practice, both as a civilian and as a police officer, to obey all posted regulatory and warning traffic signs and signals of which I am aware." He further declared that he "had been promoted to detective only a few days before the accident," and that he "would not have knowingly done anything in [his newly assigned undercover] vehicle to draw unwanted or unfavorable attention to myself, such as running a red light/sign, etc., let alone a dangerous act that someone could see me commit and for which I could be cited or which would bring a negative light on myself or the Department."

---

[2] We take the relevant facts from the record that was before the trial court when it ruled upon defendants' summary adjudication motion. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034-1035.) Unless otherwise noted, the facts recited herein are undisputed. Where the facts are in dispute, we recount plaintiffs' version of the facts.

### 2. *The Accident Site*

The accident occurred at the intersection of First Street and the southbound exit ramp off interstate 880. At the intersection, traffic exiting interstate 880 was permitted to go straight and cross the light rail tracks. Traffic travelling northbound on First Street was not permitted to turn left at the intersection and cross the light rail tracks. That prohibition was indicated in a number of ways:

1. A white arrow was painted on the pavement in the left hand traffic lane pointing straight. Pictures indicate that, at the time of the accident, that arrow was faded.

2. The intersection was controlled by a traffic signal. The green light displayed an arrow pointed straight; the yellow and red lights were the traditional spheres.

3. Immediately to the right of the traffic light was a "No Left/No U-Turn" sign. A no left/no U-turn sign displays a red circle with a slash through it over black arrows indicating a left turn and a U-turn. Pictures indicate that, at the time of the accident, the red circle and slash on the sign over the intersection were faded.

4. Two "No Left/No U-Turn" signs were located in the intersection, to the left of the left hand traffic lane where Eric was driving. The sign closest to that lane was obscured by a tree branch from more than 30 feet away. The other sign was between the two sets of light rail tracks, on the opposite side of the northbound light rails track from cars in the left hand lane on northbound First Street.

At the southeast corner of the intersection, where First Street and the interstate 880 exit ramp meet, there is a "One Way" sign pointing west, in the direction of Eric's left turn. There also was a "No Right Turn" sign at that location, advising drivers on northbound First Street not to turn right onto the exit ramp.

The City of San Jose is responsible for installing and maintaining street signs, such as the "No Left/No U-Turn" signs and the white arrow painted on the pavement at the intersection in question. According to VTA's safety supervisor in risk management, light

3

rail operators are to report obscured and faded signs to their supervisors, who in turn report such issues to the City of San Jose to remedy. The California Manual on Uniform Traffic Control Devices provides that "[e]mployees . . . of public agencies whose duties require that they travel on the roadways should be encouraged to report any damaged, deteriorated, missing or obscured signs at the first opportunity."

Approximately 29,000 vehicles a day, or eight million vehicles a year, travel in both directions on First Street in the area of the accident. Between January 2000 and Eric's accident in August 2007, four other accidents occurred at the intersection between light rail trains and vehicles making illegal left turns. Two of those accidents involved northbound trains.

### 4. VTA's Employment and Training of Knatcher

Knatcher was employed as a VTA bus driver for 13-and-a-half years before becoming a light rail operator in 1999. Knatcher completed eight weeks of training as a light rail operator at that time. Each year between 2002 and 2007, Knatcher received recertification training and passed a recertification exam.

Light rail operators are trained on five defensive driving techniques: aim high while operating, view the total traffic picture, keep your eyes scanning, leave yourself an out, and make sure others see you. They also are trained to look for possible intrusions into the rail's right-of-way, particularly at locations where vehicles are permitted to make left turns and cross over the tracks.

In 2001, Knatcher ran a red light while operating a light rail train, and she was retrained following that incident. At one point, Knatcher was reprimanded for using her cell phone while operating a light rail train.

Knatcher was involved in three other accidents as a light rail operator prior to the accident involving Eric. First, in 2000, the train she was operating collided with a vehicle at North First and Burton after the vehicle made an illegal left turn in front of the train. Knatcher was told by her supervisors that the accident was not her fault. Knatcher was

4

involved in a similar accident at the same location on July 17, 2003, when another vehicle made an illegal left turn in front of the train. The driver of the vehicle died as a result of the accident. A VTA accident review committee concluded Knatcher could not have prevented the accident. She was not retrained following the 2003 accident. On July 15, 2005, a light rail train operated by Knatcher hit a car that made an illegal right turn in front of the train.

VTA supervisors regularly perform unannounced ride checks of light rail operators, during which they ride the train to evaluate the operator's performance. Knatcher received ride checks three times a year.

On August 24, 2004, all light rail employees received a notice from the transportation superintendent outlining the proper use of bells and horns. The notice cited resident complaints about light rail noise, and indicated that the use of audible warnings should be kept to the minimum necessary to accomplish the intended warning. Light rail employees received another notice regarding the use of audible warnings on August 22, 2006. That notice set forth the crossings where audible warnings are required and the areas where such warnings are prohibited. The notice explained that, in all other areas, operators should use their discretion in sounding bells and horns.

### B.     Procedural Background

#### 1.     Government Code Section 910 claims

The Kurzes filed Government Code section 910 claims against VTA on January 25, 2008, and February 4, 2008. Both claims identified Knatcher as one of the VTA employees causing the injury. The claims were timely denied.

#### 2.     The Complaint and First Amended Complaint

The Kurzes filed their initial complaint in July 2008, naming as defendants VTA, the County of Santa Clara, the State of California, the California Department of Transportation, the City of San Jose, and Does 1 through 50. The complaint asserted claims for dangerous condition of public property and negligence against all defendants.

In March 2009, the Kurzes substituted Knatcher for Doe 1.

On October 13, 2009, the Kurzes filed the operative first amended complaint, which named VTA, the County of Santa Clara, the State of California, the California Department of Transportation, the City of San Jose, Knatcher, and Does 2 through 50 as defendants. It alleged a claim for dangerous condition of public property against all defendants except for Knatcher, and a negligence claim against all defendants. The negligence cause of action alleged negligent design, construction, and maintenance of the accident site; inadequate training and supervision of Knatcher; and various acts of negligence by Knatcher in operating the light rail train. The complaint further alleged that "each Defendant individually or fictitiously named herein acted in his, her or its right and also was or is the agent, employee, joint venturer or servant of each of the other defendants, as to each of the matters set forth herein, and each such defendant, whether individually or fictitiously named, was at all times acting within the scope and purpose of such agency, employment, venture or service, or alternatively, if the acts of each such defendant were not authorized at the time, such acts were subsequently ratified by the appropriate principal."

### 3. *VTA's First Motion for Summary Adjudication*

On June 16, 2011, VTA and Knatcher moved for summary adjudication of four issues: (1) as to the first cause of action against VTA for dangerous condition of public property, VTA sought a ruling that no dangerous condition existed and that VTA has immunity for design of the property; (2) as to the second cause of action against VTA for negligent design, construction, and maintenance, VTA sought a ruling that no dangerous condition existed and that VTA has immunity for design of the property; (3) Knatcher sought a ruling that the negligence claim against her was barred by the statute of limitations; and (4) VTA sought a ruling that the second cause of action against it for negligent training and supervision was barred by the doctrine of claim preclusion.

The trial court granted the motion as to issues Nos. 1 and 2, reasoning that there

6

was no issue of triable fact as to the existence of a dangerous condition. The court also granted the motion as to issue No. 3, concluding that the claim against Knatcher was time-barred. The court denied the motion as to issue No. 4.

### 4. *Code of Civil Procedure Section 998 Settlement Offers*

On September 21, 2011, VTA made the Kurzes an offer to settle pursuant to Code of Civil Procedure section 998 (section 998). VTA offered to waive all costs and attorney fees incurred in the litigation in exchange for entry of judgment in Eric's favor. The Kurzes did not accept the offer.

Eric made a section 998 settlement offer of $1,999,999 to VTA on October 6, 2011. VTA did not accept that offer.

### 5. *VTA's Second Motion for Summary Adjudication*

VTA filed a second motion for summary adjudication on April 13, 2012, seeking a ruling that no triable issue of fact existed with respect to whether VTA had negligently trained or supervised Knatcher.

The Kurzes opposed that motion on two grounds. First, they argued that the motion was procedurally improper because their remaining negligence claim against VTA included both the negligent training/supervision theory and a vicarious liability theory, such that the motion would not "completely dispose[] of a cause of action," as Code of Civil Procedure section 437c, subdivision (f)(1) requires. Second, relying largely on the declaration of their human factors expert, Kenneth Nemire, Ph.D., the Kurzes argued that there was sufficient evidence of negligent training and supervision to go to trial. In addition to Nemire's declaration, which pointed out various shortcomings in VTA training, the Kurzes pointed to evidence that VTA did not retrain Knatcher after prior similar accidents and discouraged the use of bells and horns. They argued that Eric's accident could have been avoided if Knatcher had sounded an audible warning when the left turn signal on Eric's vehicle became visible. The court refused to consider Nemire's declaration on several grounds and granted the motion.

7

### 6. *Motion to Strike or Tax Costs*

On August 16, 2012, the Kurzes filed a motion to strike or tax costs, arguing that VTA was not entitled to the $54,435.31 in expert witness fees it requested pursuant to section 998 because VTA had not made a good faith settlement offer. The Kurzes contended that VTA's offer to waive fees and costs was an unreasonable, token offer. The trial court denied the motion on October 29, 2012, reasoning that the offer was not made in bad faith.

### 7. *Judgment, Award of Costs, and Notice of Appeal*

The court entered judgment in favor of VTA and against the Kurzes on December 4, 2012. In the same order, the court ruled that VTA be awarded its costs. The Kurzes timely filed their notice of appeal on December 24, 2012.

## II. SUMMARY ADJUDICATION RULINGS

### A. **Standard of Review**

In reviewing an order granting summary adjudication of issues, we are governed by the rules generally applicable to review of summary judgments. (See *Tauber–Arons Auctioneers Co. v. Superior Court* (1980) 101 Cal.App.3d 268, 273.) Accordingly, we review the entire record de novo to determine whether the moving and opposing papers show a triable issue of material fact. (*Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 214.) We may affirm on any legally correct ground, "regardless of the grounds relied upon by the trial court." (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1457.)

### B. **Dangerous Condition of Public Property**

#### 1. *The Governing Statutes and the Parties' Contentions*

Under Government Code section 835, a public entity may be liable for injuries "caused by a dangerous condition of its property." The statute defines "dangerous condition" as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is

8

used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a).) The statute defines "property of a public entity" and "public property" to mean "real or personal property owned or controlled by the public entity . . . ." (*Id*., subd. (c).)

The Kurzes argue that the collection of signs at the accident site conveyed a confusing message to drivers as to whether a left turn was permitted, thus creating a dangerous condition. They claim the "No Left Turn/No U-Turn" sign next to the traffic signal was so degraded that it appeared to *authorize* left turns like the one Eric made. They contend that message was reinforced by the "One Way" sign pointing in the direction of his left turn and the fact that some cars--those exiting southbound interstate 880--are permitted to cross the tracks where Eric did. The Kurzes also claim that the other indications that a left turn was illegal were obscured. In particular, they note that the arrow painted in the lane was faded, one of the "No Left Turn/No U-Turn" signs in the intersection was obscured by tree branches from more than 30 feet away, and the other "No Left Turn/No U-Turn" sign in the intersection was located far to the left of traffic.

VTA responds that Government Code section 835 is inapplicable because VTA does not own or maintain the traffic signs at issue; the City of San Jose does. VTA further argues that no dangerous condition existed at the accident site.

### 2.      *VTA Neither Owned Nor Controlled the Property*

The definition of public property in Government Code section 830, subdivision (c), is "disjunctive rather than conjunctive," meaning a public entity is required only to own *or* control the property to be subject to liability. (*Huffman v. City of Poway* (2000) 84 Cal.App.4th 975, 989.) "[C]ontrol exists if the public entity has the 'power to prevent, remedy or guard against the dangerous condition.' " (*Id.* at p. 990.)

It is undisputed that VTA does not own the signage at the accident site. With respect to control of that signage, the Kurzes presented testimony that light rail operators

9

are obligated to report obscured and faded signs to their supervisors, who bring the signs to the attention of the City of San Jose. They also cited the California Manual on Uniform Traffic Control Devices, which "encourages" "[e]mployees . . . of public agencies whose duties require that they travel on the roadways . . . to report any damaged, deteriorated, missing or obscured signs at the first opportunity."

*Public Utilities Com. v. Superior Court* (2010) 181 Cal.App.4th 364 (*PUC v. Superior Court*) is instructive in determining whether that evidence is sufficient to permit the inference that VTA controlled the signs at the accident site. At issue in *PUC v. Superior Court* was whether the public utilities commission (PUC) controlled a railroad crossing within the meaning of Government Code section 830. The appellate court concluded that the PUC did not control the crossing because it did not own the property and was not responsible for maintaining the crossing or the surrounding area. (*PUC v. Superior Court*, *supra*, at p. 375.) Responsibility for maintaining the flashing signals at the crossing, the crossing itself, and an area two feet outside the tracks belonged to the railroad, Union Pacific; the City of Carson was responsible for maintaining the approaches and those portions of the crossing not maintained by the railroad. (*Ibid.*) While the PUC had the right to inspect the crossing for safety violations, close the crossing to vehicular and pedestrian (but not railroad) traffic, and order others to correct any defects associated with the crossing, it had no authority to correct such defects itself. (*Ibid.*) The PUC also had the authority to approve changes at the crossing, review any work to be done at the crossing, and inspect completed work at the crossing.

Like the PUC in *PUC v. Superior Court*, VTA does not maintain the signage at issue and has no authority to correct any defects in that signage. It cannot even order others to do so, as the PUC could; it merely can bring sign defects to the City of San Jose's attention. Thus, we conclude that the evidence is insufficient to permit the inference that VTA exercised some control over the signage at the accident site. (See *Chatman v. Alameda County Flood Control etc. Dist.* (1986) 183 Cal.App.3d 424, 431

10

[affirming grant of summary judgment to county flood control district on claim for dangerous condition of public property, reasoning that evidence that district inspected the culvert, required district approval of all work on the culvert, and included the culvert in a channel clearing program were insufficient to establish district "control" of the culvert under Gov. Code § 830 where private property owner was responsible for maintaining the culvert].)

Accordingly, we affirm the grant of summary adjudication in VTA's favor on the Kurzes' claim for dangerous condition of public property.

### C.    *Vicarious Liability*

The Kurzes contend that the trial court erred by considering VTA's second motion for summary adjudication and by entering judgment against them because their second cause of action for negligence against VTA included a vicarious liability theory. VTA responds that the Kurzes asserted no negligence claim based on vicarious liability in their first amended complaint. In reply, the Kurzes point to the allegation that "each Defendant individually or fictitiously named herein acted in his, her or its right and also was or is the agent, employee, joint venturer or servant of each of the other defendants, as to each of the matters set forth herein, and each such defendant, whether individually or fictitiously named, was at all times acting within the scope and purpose of such agency, employment venture or service, or alternatively, if the acts of each such defendant were not authorized at the time, such acts were subsequently ratified by the appropriate principal."

"The primary function of a pleading is to give the other party notice so that it may prepare its case . . . ." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 240.) Generally, then, the question for this court would be whether the complaint put VTA on notice that the Kurzes were asserting a vicarious liability theory of negligence. However, here, "plaintiffs bear the further burden of particularity in pleading their tort-based causes of action, since defendant is a public entity." (*Zipperer v. County of Santa Clara* (2005)

11

133 Cal.App.4th 1013, 1020.) Thus, the complaint can be found to state a claim for negligence based on vicarious liability only if "every fact essential to the existence of statutory liability [is] pleaded with particularity, including the existence of a statutory duty." (*Searcy v. Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 802.)

The complaint does not satisfy that heightened pleading standard because it does not identify the statutory basis for vicarious liability against a governmental entity, Government Code section 815.2, subdivision (a). Moreover, the boilerplate allegation on which the Kurzes rely is the kind of "secondary-liability allegation[]" our Supreme Court has derided as "egregious examples of generic boilerplate." (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 134, fn. 12.) That allegation is insufficient to allege vicarious liability, particularly in view of the heightened pleading standard. (See *Simmons v. Ware* (2013) 213 Cal.App.4th 1035, 1049 [complaint did not plead issue of joint venture liability where it contained no allegations to support a joint venture theory of liability aside from a generic boilerplate allegation that " 'each [d]efendant was the agent and employee of every other [co-d]efendant,' " insufficient].)

Accordingly, we conclude that the trial court did not err in considering the second motion for summary adjudication.

### D. Negligent Training

Government Code section 815 requires a statutory basis for the imposition of direct liability on a public entity. (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1182.) The Kurzes' claim for negligent training and supervision is a direct liability claim in that it alleges negligence by VTA, not negligence by VTA employees in training Knatcher, for which VTA might be vicariously liable. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1127 [distinguishing between direct and vicarious liability of a public entity]; cf. *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 868 [addressing theory that public entity was vicariously liable for the actions of administrative or supervisory personnel in hiring, supervising and retaining

12

other employees].)

The Kurzes fail to identify a statutory basis for their negligent training and supervision claim. We requested the parties to address this failure in supplemental letter briefs. VTA argued in its supplemental brief that the Kurzes' failure to assert a statutory basis was fatal to the claim. The Kurzes did not deny that they failed to identify a statutory basis for the claim, nor did they assert any such basis. Rather, they maintained that the failure was a mere procedural deficiency to which VTA waived any objection by failing to raise one below. We disagree because governmental immunity is a jurisdictional question that may be raised for the first time on appeal. (See *Inland Empire Health Plan v. Superior Court* (2003) 108 Cal.App.4th 588, 592; *Kemmerer v. County of Fresno* (1988) 200 Cal.App.3d 1426, 1435 [considering governmental immunity defense where it was first raised in supplemental briefs requested by the appellate court].)

Because the Kurzes identify no statutory basis for their claim, it fails. (See *de Villers v. County of San Diego* (2007) 156 Cal.App.4th 238, 255-256 ["direct claim against a governmental entity asserting negligent hiring and supervision, when not grounded in the breach of a statutorily imposed duty owed by the entity to the injured party, may not be maintained"]; *Berman v. Sink* (E.D. Cal. May 29, 2013) [2013 U.S. Dist. LEXIS 75443] [applying California law and granting motion for summary judgment to county on plaintiff's claim for negligent supervision or training because plaintiff failed to provide any statutory basis for the county's liability]; *Hernandez v. County of Marin* (N.D. Cal. Nov. 14, 2013) [2013 U.S. Dist. LEXIS 162476] [applying California law and dismissing cause of action for negligent training and supervision because plaintiffs did not allege a statutory basis for the negligence action as required under state law].)

## III.   MOTION TO STRIKE OR TAX COSTS

### A.   *Standard of Review*

Section 998 is a cost-shifting statute designed to encourage pretrial settlements and avoid needless litigation. (*Barba v. Perez* (2008) 166 Cal.App.4th 444, 451.) It

13

provides that "[i]f an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, . . . the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." (§ 998, subd. (c)(1).) To be valid, a section 998 offer must be made in good faith, which requires that the offer of settlement be " 'realistically reasonable under the circumstances of the particular case.' " (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1262.) " 'Normally, therefore, a token or nominal offer will not satisfy this good faith requirement.' " (*Ibid.*)

"As a general rule, the reasonableness of a defendant's offer is measured, first, by determining whether the offer represents a reasonable prediction of the amount of money, if any, defendant would have to pay plaintiff following a trial, discounted by an appropriate factor for receipt of money by plaintiff before trial, all premised upon information that was known or reasonably should have been known *to the defendant*. . . . [¶] If the offer is found reasonable by the first test, it must then satisfy a second test: whether defendant's information was known or reasonably should have been known to plaintiff. This second test is necessary because the section 998 mechanism works only where the offeree has reason to know the offer is a reasonable one." (*Elrod v. Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 699, fn. omitted.) "Where, as here, the offeror obtains a judgment more favorable than its offer, the judgment constitutes prima facie evidence showing the offer was reasonable and the offeror is eligible for costs as specified in section 998. The burden is therefore properly on plaintiff[s], as offeree[s], to prove otherwise." (*Id.* at p. 700.) We review the trial court's determination that a section 998 offer was reasonable and made in good faith for abuse of discretion. (*Elrod v. Oregon Cummins Diesel, Inc.*, *supra*, at p. 700.)

14

### B. Discussion

The Kurzes contend VTA's offer to settle for a cost waiver was unreasonable in view of Eric's settlement offer of almost $2 million. We conclude the Kurzes have not met their burden of showing that the trial court exercised its discretion in "an arbitrary, capricious or patently absurd manner." (*Culbertson v. R. D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704, 710 (*Culbertson*).)

A defendant is entitled to make a "modest settlement offer," even if substantial damages are claimed, based on his perception that he has a strong case. (*Culbertson*, *supra*, 190 Cal.App.3d at p. 710.) Indeed, courts have held that an offer to waive costs may be in good faith where it has significant monetary value. (See *Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 471; *Jones v. Dumrichob*, s*upra*, 63 Cal.App.4th at p. 1264.) That was the case here, as VTA sought over $60,000 in costs. Furthermore, "the mere fact" that a plaintiff claimed large losses "does not mean that defendants' . . . offer was unreasonable or unrealistic." (*Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 118.) Here, the trial court reasonably could have concluded that the settlement offer to waive costs was reasonable based on the fact that VTA had denied liability, and particularly causation, throughout the litigation. (See *Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1528-1529 [" 'When a defendant perceives himself to be fault free and has concluded that he has a very significant likelihood of prevailing at trial, it is consistent with the legislative purpose of section 998 for the defendant to make a modest settlement offer.' "].)

### IV. DISPOSITION

The judgment is affirmed. VTA shall recover its costs on appeal.

                                              _____

                                                    Premo, J.

WE CONCUR:

_____

                Rushing, P.J.

_____

                Elia, J.