Filed 1/22/20; Certified for Publication 2/13/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| IRMA YOLANDA MUNOZ SOTO, | B289712 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC638956) |
| v. | |
| UNION PACIFIC RAILROAD COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge. Affirmed.

Haffner Law, Joshua H. Haffner, Graham G. Lambert, Michael K. Teiman; Martinian & Associates, Tigran Martinian and Suzanna Abrahamian for Plaintiff and Appellant.

Pacific Employment Law, Joseph P. Mascovich; Union Pacific Railroad Co., Melissa Ann Sandoval; Murphy, Campbell,

Alliston & Quinn and Stephanie Lynn Quinn for Union Pacific Railroad Company, Robert Finch and Scott King.

—————————————————

Irma Yolanda Munoz Soto sued Union Pacific Railroad Company and two of its employees, Scott King and Robert Finch (collectively Union Pacific parties), for wrongful death (premises liability and general negligence) after Soto's 16-year-old daughter was struck and killed by a freight train on an at-grade railroad crossing in Santa Clarita. The court granted the Union Pacific parties' motion for summary judgment, concluding as to Soto's premises liability claim Union Pacific had no duty to remedy a dangerous condition because it did not own or control the railroad crossing. As to Soto's negligence claim, the court ruled Soto could not establish that Union Pacific employees had negligently operated the train. On appeal from the judgment entered after the motion was granted, Soto contends she raised triable issues of material fact sufficient to defeat summary judgment. Although we cannot overstate the tragic scope of Soto's loss, based on the evidence and governing law, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Accident*

Soto's teenage daughter, Kimberly Jimenez-Soto, routinely walked along an unpaved path near the intersection of Rainbow Glen Drive and Soledad Canyon Road in Santa Clarita to get to her school bus stop. To reach the bus stop, it is necessary to traverse an at-grade railroad crossing for a railway line (then known as the Saugus line), which runs parallel to and just south of Soledad Canyon Road. The railway line is owned by the

Southern California Regional Rail Authority, doing business as Metrolink.

The railroad crossing was marked with signs, flashing lights, warning bells, a mast and cantilever structure containing additional lights, and automatic levers that lowered as trains approached the crossing, preventing vehicular traffic from entering the crossing until after the trains had passed.  There was no separate pedestrian barrier or gate.

On the morning of November 7, 2014, as Jimenez-Soto and other children took their regular route to the bus stop, the bells, whistles, flashing lights and automatic lever blocking vehicular traffic were all working and activated, indicating the approach of an oncoming train.  Jimenez-Soto, walking on the unpaved path with her head down, did not heed any of the warnings.  She continued unimpeded through a large open space near the vehicular gates and stepped directly onto the tracks.  Almost immediately, a Union Pacific freight train, operated by conductor Robert Finch and engineer Scott King, fatally struck Jimenez-Soto.

2.  *Soto's Lawsuit*

Soto's wrongful death action alleged causes of action for premises liability (against Union Pacific only) and negligence (against all the Union Pacific parties).  As to the first claim, Soto alleged Union Pacific owned the crossing, knew it posed a danger to the public and failed to ensure proper safety measures, such as a pedestrian barrier, were in place to prevent or discourage children from accidentally walking onto the track.  In support of her negligence cause of action, Soto alleged Finch and King had breached their duty of care to operate the train safely and Union Pacific was vicariously liable for their negligence.

3. *The Union Pacific Parties' Motion for Summary Judgment*

    a. *Premises liability*

The Union Pacific parties moved for summary judgment. Addressing Soto's cause of action for premises liability, Union Pacific argued it had no duty to make the premises safe for pedestrians because it did not own, possess or control the railroad tracks, the land or the crossing. Union Pacific supplied evidence that its predecessor-in-interest, Southern Pacific Transportation Company, sold the land, the railroad tracks and all improvements in October 1990 to the Los Angeles County Transportation Commission (Commission), the predecessor-in-interest to Metrolink. In 1992 Southern Pacific and the Commission entered into a shared-use agreement to delineate "their respective rights and obligations concerning operation of the Saugus [l]ine after its acquisition by the Commission . . . and to preserve [Southern Pacific's] Rail Freight Service both now and in the future on a service competitive-basis." In the agreement the Commission granted Southern Pacific an "easement and trackage rights on and over" the Santa Clarita crossing.

Section 2.2 of the shared-use agreement granted Union Pacific[1] the right to use the tracks, crossing and the warning systems (collectively "shared-use facilities")[2] for its freight train

---

[1] For clarity, in explaining the parties' rights under the shared-use agreement, we refer to Union Pacific and Metrolink rather than to their predecessors-in-interest.

[2] Section 1.56 of the shared-use agreement defined shared-use facilities as "[t]he Shared Use Tracks, all improvements relating thereto, all improvements used in rail service located

4

service.  Union Pacific had no other rights to those facilities "other than the rights expressly provided" in the shared-use agreement.  The agreement also provided that Metrolink, which owned the shared-use facilities, had "exclusive control" over their operation, maintenance and repair.

Citing the shared-use agreement, Union Pacific argued it had only a limited easement to use the tracks for its freight train service.  Because it did not own, possess or control the crossing, Union Pacific asserted, it had no duty to ameliorate any dangerous condition located on the property, including the duty to construct a pedestrian barrier.

b. *The negligence claim*

The Union Pacific parties argued they were not negligent as a matter of law in operating the freight train.  In support of their motion they submitted the expert declaration of Brian P. Heikkila, a railroad consultant with more than 40 years' experience in the railroad industry.  Heikkila had reviewed the track imaging recording (TIR), which, among other data, contained a video recording of the view from the front of the train as it approached the crossing and struck Jimenez-Soto.[3]  He also reviewed, among other materials, Union Pacific's Air Brake and Train Handling Rules, the General Code of Operating Rules (GCOR) for railroads in the United States and Metrolink's

---

within the Right-of-Way as of the date of execution of this Agreement . . . and all other Tracks and other facilities constructed pursuant to any provisions of this Agreement except, unless otherwise agreed to in the future by [Metrolink] and [Union Pacific] . . . ."

[3]     The TIR was filed under seal in the trial court pursuant to a stipulated protective order.

5

System Special Instructions and Additions and Revisions to the GCOR.[4]

In Heikkila's opinion the train was operated in full compliance with federal regulations and all Union Pacific safety guidelines and could not have been stopped prior to its impact with Jimenez-Soto. Heikkila explained, "Engineer King was operating [the train] at approximately 44 m.p.h. leading up to and at the time of the incident, which was in compliance with the 45 m.p.h. timetable speed limit set for freight trains by Metrolink at this location, and well below the 60 m.p.h. federal freight train speed limit for [Federal Railroad Administration (FRA)] Class 4 track (49 C.F.R. Part 213.9). . . . [¶] . . . My analysis of the TIR and event recorder data also indicates that the warning bell and warning horn sequence sounded by Engineer King commenced approximately 18 seconds prior to the train's arrival at the Rainbow Glen Drive crossing, as required by the [GCOR] (GCOR, Rule[s] 5.8.1, 5.8.2) and FRA regulations (49 C.F.R. Part 222.21), thereby providing a total of approximately 19 seconds of bell and horn warning prior to impact.

". . . The Rainbow Glen Drive grade crossing features an array of warning devices for approaching pedestrians and motorists that includes railroad crossing pavement markings, reflectorized cross buck warning signs, mast-mounted red flashing warning lights, automated crossing gates with additional

---

[4]     Based on his review of these materials, Heikkila described the freight train that killed Jimenez-Soto as consisting of two locomotives pulling from the front, two remotely controlled locomotives in the rear and 67 empty rail cars. The train was approximately 3,377 feet long and weighed approximately 2,010 tons.

red flashing warning lights, and warning bells that are activated by approaching trains. . . . A review of the TIR and witness testimony indicates that the gates, lights, and bells were activated during the train's approach and at the time of the incident.

". . . Based on my analysis of the TIR video . . . Ms. Jimenez-Soto was first present on the track at the Rainbow Glen Drive crossing approximately 1.2 seconds prior to impact. Analysis of the event recorder and TIR also indicates that Engineer King put the train into emergency braking shortly after impact, which then required a distance of approximately 1,096 feet to stop over a period of approximately 32 seconds. In order to have stopped the train prior to impact, it would have been necessary to apply the emergency brakes approximately 1,096 feet prior to impact. However, at that point, the train would have been more than 16 seconds away, not counting perception-reaction time, with no indication to the crew of any need to apply the emergency brakes.

". . . [T]he first opportunity for Engineer King to get a glimpse of Ms. Jimenez-Soto beginning to pass the lowered crossing arm and the mast it was attached to, was approximately 3.2 seconds prior to impact. However, in order to have stopped the train prior to the impact, it would have been necessary to apply the emergency brakes approximately 1,096 feet prior to impact. At that point, the train would have been more than 16 seconds away, not counting perception-reaction time, with no indication to the crew of any need to apply the emergency brakes.

". . . Under the circumstances, during the closing seconds prior to impact when Ms. Jimenez-Soto first stepped past the gate there was no opportunity for the crew to stop or slow the

7

train, or take any additional evasive action that could have prevented the incident. [¶] . . . In summary, based on my site inspection and review of the materials, the train was operated in accordance with Union Pacific rules and federal regulations, and consistent with standards of care in the railroad industry. . . ."

In their separate declarations in support of Union Pacific's motion, train conductor Finch and locomotive engineer King stated the train was travelling eastbound at approximately 45 miles per hour. About one-quarter mile from the crossing, at the location of the whistle board,[5] King sounded the locomotive's horn in the proper sequence (two long sounds, a short sound, and a long sound). As the train approached the crossing, both Finch and King observed Jimenez-Soto walking northbound "about 100 yards" from the crossing. At the time of their observation, all safety features had been activated at the crossing: The crossing arm gates were in the downward position; the warning lights were flashing; and vehicular traffic was stopped behind the gates. King continued to sound the horn. Suddenly, Jimenez-Soto "walk[ed] past the activated warning devices and past the area where the cars were stopped" and onto the tracks. As soon as he saw Jimenez-Soto step onto the tracks, King moved the locomotive controls from the power position to idle and applied the emergency brakes.

The Union Pacific parties also provided the deposition testimony of Frank Ferraro, who was in his car behind the vehicular gates, waiting for the train to pass, when the accident

---

[5]     A whistle board, in railroad usage, is a sign marking a location where a locomotive engineer is required to sound the horn or whistle.

8

occurred. Ferraro testified he saw Jimenez-Soto weave through other children on the unpaved path as she walked toward the bus stop. Other children were stopped at the crossing. Ferraro expected Jimenez-Soto to stop, too; but she continued onto the tracks and was struck by the freight train.

4. *Soto's Opposition to the Motion for Summary Judgment*

In her opposition papers Soto did not dispute that Metrolink owned the land, the tracks and the crossing and warning systems. However, citing section 2.5 of the shared-use agreement entitled "Additional Improvements," which provided that Metrolink "shall permit additional improvements to the Shared Use Facilities reasonably requested by [Union Pacific], which approval shall not be unreasonably withheld," Soto argued Union Pacific had sufficient control of the premises to impose a duty of care to ameliorate a dangerous condition at the crossing. Soto also cited the testimony of Michelle Martinson, Union Pacific's person-most-knowledgeable concerning the shared-use facilities. Martinson confirmed Union Pacific had requested at least one improvement on another part of the Saugus line— enlarging tunnel clearances so Union Pacific could run taller freight trains—and Metrolink had approved that request without issue.

In addition, Soto provided a declaration from civil engineer Brad Avrit. Avrit opined the crossing presented a dangerous condition because a pedestrian walking along the unpaved pathway would be able to travel in a straight line from one part of the unpaved road onto the tracks without encountering a barrier. According to Avrit, the most effective barrier to protect unwary pedestrians, including children, from harm would be "a physical barrier like a swing gate or a lever arm designed to block

9

the pedestrian path." Union Pacific objected to much of Avrit's testimony that the crossing presented a dangerous condition, arguing it was conclusory, lacked proper foundation and was based on speculation and conjecture. The court sustained those objections.

Jimenez-Soto's sister stated in her declaration it was Jimenez-Soto's practice to wear earphones on her way to school and there was no reason to believe Jimenez-Soto did not act consistently with that practice on the day she died. (Soto surmised Jimenez-Soto's earphones were the likely reason Jimenez-Soto did not hear bells and whistles warning of the train.)

Soto's counsel also provided a declaration stating he had deposed King only a few days prior to submitting Soto's opposition papers and, as a consequence, King's deposition transcript was not yet available. In lieu of a transcript Soto's counsel averred King had testified he had adopted a practice since the accident of slowing the train down at all at-grade crossings. The court sustained the Union Pacific parties' objection to this evidence because Soto's counsel had failed to explain the reasons he could not obtain an expedited transcript to submit the court.

Finally, highlighting the findings of Union Pacific's own expert, Heikkila, that King had waited until impact to apply the emergency brakes, Soto argued a triable issue of material fact existed as to whether the failure to apply the brakes earlier was reasonable and, if not, whether that unreasonable delay had caused the accident.

10

5. *The Court's Ruling Granting Summary Judgment*

The court granted the Union Pacific parties' motion for summary judgment. Relying on the rights and duties prescribed in the shared-use agreement, the court ruled Union Pacific did not own, possess or control the crossing and therefore lacked the duty to mitigate or prevent any dangerous condition on the property.[6] The court also ruled Soto could not establish the Union Pacific parties were negligent in their operation of the train. The court entered judgment in favor of the Union Pacific parties. Soto filed a timely notice of appeal.

## DISCUSSION

1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo and, viewing the evidence in the light most favorable to the nonmoving party (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 703), decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.)

---

[6] Alternatively, as to the premises liability claim, the court ruled the PUC's exclusive jurisdiction over warning systems at railroad crossings preempted Soto's action to the extent it was based on the failure to install a pedestrian barrier.

11

2. *The Court Did Not Err in Granting Summary Judgment on Soto's Premises Liability Claim*

a. *Governing law*

One who owns, possesses or controls land has a duty to act reasonably to protect others from a dangerous condition on the property. (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1162 (*Alcaraz*); see Civ. Code, § 1714, subd. (a) [imposing liability for failure to exercise "ordinary care or skill in the management" of property].) The "'crucial element'" for imposing a duty in such circumstances is control (*Alcaraz,* at p. 1160 ["'[w]hoever controls the land is responsible for its safety'"]), the rationale being that whoever has the means to control the property can take steps to prevent the harm. (See *Salinas v. Martin* (2008) 166 Cal.App.4th 404, 414 [quoting *Alcaraz*]; *Martinez v. Bank of America* (2000) 82 Cal.App.4th 883, 892 [landlord liability for dangerous condition on property occupied by tenant depends upon landlord's degree of control; "'the landlord must also have the opportunity and the ability to eliminate the dangerous condition being created by the tenant'"]; cf. *Public Utilities Com. v. Superior Court* (2010) 181 Cal.App.4th 364, 378 (*Millan*) ["control" in the context of premises liability depends on whether the defendant had the "power to prevent, remedy or guard against the dangerous condition"]; see generally *Preston v. Goldman* (1986) 42 Cal.3d 108, 119 ["we have placed major importance on the existence of possession and control as a basis for tortious liability for conditions on the land"].)

Conversely, "[a] defendant cannot be held liable for a defective or dangerous condition of property it did not own, possess or control." (*Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 125; accord, *Cody F. v. Falletti* (2001) 92 Cal.App.4th 1232, 1241 (*Cody F.*) ["[t]he law does not impose

12

responsibility where there is no duty because of the absence of a right of control"]; cf. *Alcaraz*, *supra*, 14 Cal.4th at p. 1161 ["[D]efendant could not escape liability merely by establishing that . . . a neighbor, rather than the defendant, actually held title to the land containing the dangerous condition. As long as the defendant exercised control over the land, the location of the property line would not affect the defendant's potential liability"].)

When the evidence concerning control is undisputed, as here, the question of duty remains a legal question we review de novo. (See *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1142 ["'[d]uty is a question of law for the court, to be reviewed de novo on appeal'"] *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770 [same]; cf. *Alcaraz*, *supra*, 14 Cal.4th at p. 1162 & fn. 4 [although duty is a question of law, when evidence concerning control is in conflict, summary judgment is improper].)

      b. *The court properly ruled Union Pacific had no duty to make the premises safe because it did not own, possess or control the crossing*

Soto acknowledges that Union Pacific does not own the land, the Rainbow Glen Drive crossing or any of the other shared-use facilities and, consequently, whether it had a duty of care for purpose of potential premises liability depends on the scope of control conferred by the easement. (See *Cody F.*, *supra*, 92 Cal.App.4th at p. 1243 ["[t]he nature of the duty owed by the owner of an interest in real property must have a relationship to the degree of control conferred by the scope of the ownership interest itself"].) Relying on paragraph 2.5 of the shared-use agreement, Soto contends Union Pacific's contractual right to request "additional improvements" to the Saugus line, coupled with Metrolink's contractual obligation not to unreasonably

13

withhold its approval for such requests, gave Union Pacific sufficient control of the crossing to impose a duty to remedy a dangerous condition. According to Soto's argument, all Union Pacific had to do to protect the lives of children was request that Metrolink install a pedestrian barrier. Metrolink would have certainly granted such a reasonable request; and, if Metrolink did not, Union Pacific had the additional power to enforce the shared-use agreement in arbitration under the contract's terms.

Soto's expansive interpretation of section 2.5 relies upon a flawed assumption. Simply stated, Union Pacific's contractual right to enforce Metrolink's obligation to exercise good faith in evaluating Union Pacific's requests for improvement, without more, is not sufficient control of the premises to impose liability for failing to correct a dangerous condition. (See *Millan, supra,* 181 Cal.App.4th at p. 379 [PUC's ability to file a lawsuit to enforce regulatory authority did not give PUC "control" over crossing for purposes of creating a duty when "the uncontradicted evidence established that the PUC lacked the authority to actively maintain or repair the crossing and had only the authority to order others to correct or upgrade"]; cf. *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1087 [affirming finding of no duty; while landowner had ability to request municipality install traffic control device to ameliorate danger on public street, the "ultimate decision [was] up to that [municipal] authority"].)

*Cody F., supra,* 92 Cal.App.4th 1232, which Soto cites to support her argument, only reinforces our conclusion. In *Cody F.,* a dog attacked a child on a private road that provided access to a subdivision. Each of the homeowners in the subdivision possessed an easement to use the private road for ingress and

14

egress.  The victim of the dog attack sued, among others, each of the homeowners, asserting the homeowners' access easements subjected them to the same duty imposed on any property owner—to act reasonably to keep the property (the private road) safe from dangerous conditions.  The appellate court rejected this overbroad conception of duty, emphasizing the degree of control of the easement holder was limited by the rights granted in the easement.  Because "[t]he respondents did not have a right of control over Wick's [the dog owner's] property, Wick's dogs, or the road[,]" the court ruled, the easement holders could not be liable for any dangerous condition.  (*Id*. at p. 1241.)

Extrapolating from the *Cody F*. court's observation that it was unaware of any case "in which an easement holder was held responsible for an action that had no relationship to the scope of the easement granted" (*Cody F., supra,* 92 Cal.App.4th at p. 1243), Soto argues all that is required to impose a duty of due care on Union Pacific as an easement holder is to demonstrate the relationship between the harm (train accident) and the purpose of Union Pacific's easement (running its freight trains), which, she maintains, she unequivocally did.  Soto misapprehends the import of the court's statement, which simply recognized that the easement holders had no control over a dangerous condition unrelated to its easement.  Nothing in the court's opinion eliminated the essential requirement of control over the land containing the dangerous condition, which the *Cody F*. court confirmed was at the heart of any claim for premises liability.  (*Cody F.,* at p. 1241; accord, *Alcaraz, supra,* 14 Cal.4th at p. 1158; *Preston v. Goldman, supra,* 42 Cal.3d at p. 119.)

15

The court in *Cody F.* also rejected the plaintiffs' contention, similar to the enforcement argument Soto makes here, that each homeowner's ability to sue to enforce covenants and restrictions prohibiting other homeowners from housing dangerous pets provided the homeowners with the requisite control necessary to impose a duty of due care in connection with the private road. The *Cody F.* court explained the right of the easement holders to file a lawsuit to enforce covenants and restrictions was optional, not mandatory. There was no actual duty to exercise those rights. (*Cody F., supra,* 92 Cal.App.4th at p. 1245; cf. *Millan, supra,* 181 Cal.App.4th at p. 379 [public agency's right to sue to enforce its rules was not tantamount to control of land for premises liability purposes].)

Soto's reliance on *Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504 (*Uccello*) is similarly misplaced. There, a visitor injured by the tenant's dangerous dog sued the landlord for failing to protect others from the tenant's dangerous pet. The trial court entered a nonsuit in favor of the landlord following the plaintiff's opening statement. The appellate court reversed, holding a jury could find the landlord knew the dog was vicious and had sufficient control over the premises to prevent the injury. Specifically, because the landlord had the right, under a month-to-month tenancy agreement, to terminate the tenant's lease upon two weeks' notice and rent the premises to someone else if the tenant continued to house the dog on the property, the court found "[i]t reasonably may be said that by virtue of the right of termination, [landlord] had sufficient control over the premises so as to bring the case within an exception to the general rule of nonliability." (*Id.* at p. 512.) Unlike the landlord in *Uccello*, Union Pacific had no control over the dangerous condition, and no

16

right to terminate the shared-use agreement. Any right to construct a barrier belonged exclusively to Metrolink, which owned the property and maintained "exclusive control" over the shared-use facilities.

Relying on *Low v. City of Sacramento* (1970) 7 Cal.App.3d 826, 833-834 (*Low*), Soto asserts that, at minimum, a jury could find Union Pacific and Metrolink jointly controlled the shared-use facilities. *Low* involved an action against the county for dangerous condition of public property. Under Government Code section 830, subdivision (c), public property includes "real or personal property owned or controlled by the public entity, but does not include easements . . . located on the property of the public entity but are not owned or controlled by the public entity." The plaintiff in *Low* fell on a parking strip while visiting a county hospital. The county owned the property, but had granted a street easement to the city that included the parking strip. On appeal following a liability verdict against both the county and the city, the county argued it had no liability as a matter of law because it had ceded control of the parking strip to the city when it granted the city the easement. The court of appeal affirmed the jury's verdict against the county, citing evidence that the county had continued to maintain the parking strip despite the easement and hence retained, along with the city, sufficient control of the parking strip to remedy the dangerous condition. (*Low*, at pp. 833-834.)

Soto insists that, like the city and county in *Low,* Union Pacific and Metrolink shared maintenance duties for, and thus control of, the crossing. To support this contention, Soto relies on a provision in the shared-use agreement requiring Union Pacific to pay an "agreed annual share" to cover maintenance and

annual wear and tear caused by its use of the shared-use facilities, and Martinson's testimony confirming that Union Pacific paid a maintenance fee in accordance with the terms of the shared-use agreement. Significantly, Soto cites no authority for the proposition that the mere payment of a fee for maintenance is the equivalent of actual maintenance or control and we are not aware of any. A homeowner, for example, may pay a fee to a homeowner's association for maintenance of common areas, but that payment alone would not make the homeowner liable for injuries due to a dangerous condition in a common area. (Cf. *Amos v. Alpha Property Management* (1999) 73 Cal.App.4th 895, 898 [citing landlord's duty of care over common areas].) In any event, any ambiguity on this point is resolved by the language of the shared-use agreement, which, in addition to requiring Union Pacific to pay a maintenance fee, expressly states that Metrolink retains "exclusive control" over operation, maintenance and repair of the shared-use facilities. And, unlike in *Low,* Soto presented no evidence of maintenance incompatible with that contract term.

Finally, as part of her joint-control argument, Soto highlights section 7.2 of the shared-use agreement, which allocates liability/damages for personal injury between Union Pacific and Metrolink depending on the circumstances of the injury. For example, section 7.2(c)(v), provides that liability for personal injury to a person at a crossing who is not an invitee shall be borne by Union Pacific if its train was involved in the accident, by Metrolink if its train was involved, and by both Metrolink and Union Pacific equally if both of their trains were involved. Section 7.2 does not assist Soto. The contracting parties' agreed allocation of liability/damages for personal injury

18

is immaterial to Soto's contention that Union Pacific controlled the shared-use facilities for purposes of imposing a duty of care.[7]

### 3. *Summary Judgment Was Properly Granted in Union Pacific's Favor on Soto's Negligence Claim*

Union Pacific unquestionably had a duty of care to operate its trains safely. (Civ. Code, § 1714, subd. (a); see *Kesner v. Superior Court*, *supra*, 1 Cal.5th at p. 1142 ["'California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others'"].) In granting summary judgment the court ruled Union Pacific had carried its initial burden to establish it exercised due care in accordance with industry standards and Soto had failed to raise a triable issue of material fact on that question.

Soto disputes the court's ruling, insisting Union Pacific failed to carry its initial burden because it submitted no admissible evidence that the train's speed at the crossing was reasonable and in accordance with the governing speed

---

[7] The parties argue that the public policies identified in *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 (the "*Rowland* factors") support their respective arguments. In light of our holding that Union Pacific had no duty to make the premises safe, we do not address the *Rowland* factors, which apply when a statutory duty of care is found to exist and the question presented is whether public policy supports a departure from that general duty of care. (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 628 [*Rowland* evaluated to determine if the court should "depart from the general rule of duty"]; *Vasilenko v. Grace Family Church, supra,* 3 Cal.5th at p. 1083 [*Rowland* factors weighed only when determining whether a departure from general duty of care is appropriate]; *Kesner v. Superior Court*, *supra*, 1 Cal.5th at p. 1143 [same]; *Cabral v. Ralphs Grocery Co., supra*, 51 Cal.4th at p. 771 [same].)

limitations for that track/crossing.  However, Heikkila stated, based on the materials he reviewed and his personal knowledge of the track, the applicable speed limit for that track and that crossing was 45 miles per hour, which was the train's speed at the time Jimenez-Soto was killed.  Soto objected to this aspect of Heikkila's testimony as hearsay, but the court overruled her objection.  Soto does not challenge this evidentiary ruling on appeal.  Accordingly, she has forfeited that claim.  (*Frittelli, Inc. v. 350 North Canon Drive LP* (2011) 202 Cal.App.4th 35, 41 [a party that fails to "attack the [trial court's evidentiary] rulings on appeal . . . forfeit[s] any contentions of error regarding them"]; *Lopez v. Baca* (2002) 98 Cal.App.4th 1009, 1014-1015; see generally *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 ["'absence of cogent legal argument or citation to authority allows this court to treat the contention as waived'"].)

Relying on *Peri v. L.A. Junction Ry.* (1943) 22 Cal.2d 111, 121 (*Peri*), Soto also contends triable issues of material fact exist as to whether the train's speed of 44 or 45 miles per hour was reasonable at an at-grade crossing frequently travelled by children on their way to a school bus.  (See *ibid.* ["'While it is true that no rate of speed is negligence *per se* in the absence of a statute or ordinance, it does not follow that a railroad company will be permitted to run its trains under *all conditions* at any rate of speed it may choose.  It must regulate its speed with proper regard for the safety of human life and property, especially when running through towns and cities.'"].)

*Peri,* however, was decided before Congress passed the Federal Railroad Safety Act of 1970 (FRSA) (49 U.S.C. § 20101 et seq.), designed "to promote safety in every area of

20

railroad operations and reduce railroad-related accidents and incidents" (49 U.S.C. § 20101) by making "laws, regulations, and orders related to railroad security . . . nationally uniform to the extent practicable" (49 U.S.C. § 20106(a)(1)). In 2007 Congress clarified the scope of the FRSA and its preemptive effect when it expressly excluded from FRSA's preemptive reach only those state law claims for damages based on allegations that a party failed to comply with (1) the federal standard of care; (2) its own plan, rule or standard; or (3) a state law regulation or order not incompatible with the FRSA. (49 U.S.C. § 20106(b)(1)(A)-(C); see *CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658, 664 [113 S.Ct. 1732, 123 L.Ed.2d 387] (*Easterwood*) [plaintiff's state law negligence/wrongful death claim based on excessive speed alone did not satisfy preemption exceptions under 49 U.S.C § 20106(b)(1), and was thus preempted by FRSA]; see generally *Fair v. BNSF Railway Co.* (2015) 238 Cal.App.4th 269, 277-278 ["FRSA preempts covered state law tort claims, in addition to covered statutes and regulations"].) Soto's excessive speed claim does not involve allegations of Union Pacific's failure to comply with federal or state laws or regulations or its own internal rules or standards. Accordingly, as in *Easterwood,* that aspect of Soto's negligence action is preempted.

Soto asserts that, at the very least, triable issues of material fact exist as to whether King should have applied the brakes earlier, rather than waiting until impact to do so. Assuming, without deciding, that this type of negligence action is not preempted by the FRSA (see *Easterwood, supra,* 507 U.S. at p. 675, fn. 15 ["this case does not present, and we do not address, the question of FRSA's pre-emptive effect on" common law claims involving "the duty to slow or stop a train to avoid a specific,

21

individual hazard"]), Union Pacific carried its burden on summary judgment to show it had no reason to apply the brakes to avoid a hazard until it was too late.  Heikkila opined in his declaration (1) there was no federal or state regulation requiring the train to slow down at the crossing; (2) there was no reason for King to have slowed the train upon approaching the crossing; and (3) King and Finch exercised due care in the operation of the train before and at the crossing in accordance with railroad industry standards.  Heikkila also explained that earlier application of the brakes to avoid Jimenez-Soto would not have made any difference.  To have avoided the accident, King would have had to apply the brakes more than 16 seconds before impact, long before Jimenez-Soto stepped onto the tracks. Significantly, Soto supplied no evidence to rebut Heikkila's declaration.  Her speculation that earlier braking was possible and may have lessened the magnitude of Jimenez-Soto's injuries is not sufficient to defeat summary judgment.  (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 ["[s]peculation . . . is not evidence"]; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1487 [opposing party cannot controvert moving party's unequivocal expert declarations with speculation and conjecture].)

## DISPOSITION

The judgment is affirmed. The Union Pacific parties are to recover their costs on appeal.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.

Filed 2/13/20

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| IRMA YOLANDA MUNOZ SOTO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>UNION PACIFIC RAILROAD COMPANY et al.,<br><br>    Defendants and Respondents. | B289712<br><br>(Los Angeles County Super. Ct. No. BC638956)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION (NO CHANGE IN THE APPELLATE JUDGMENT) |

THE COURT:

The opinion in this case filed January 22, 2020 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), respondent Union Pacific Railroad Company's request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

PERLUSS, P. J.          ZELON, J.          SEGAL, J.